EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Melissa Pérez Rodríguez<br><br>Peticionaria<br><br>v.<br><br>Sasha Marie López Rodríguez; Jaso J. Ramos López; Luis Antonio Negrón Romero, por sí y en representación del menor E.N.L.<br><br>Recurridos | Certiorari<br><br>2022 TSPR 95<br><br>209 DPR ____ |

Número del Caso: CC-2020-157


Fecha: 12 de julio de 2022


Tribunal de Apelaciones:

    Panel VIII


Abogados de la parte peticionaria:

    Lcda. Glenda Labadie Jackson
    Lcdo. Ismael García Ortega
    Lcdo. Paul Rodríguez Vélez


Abogadas de los recurridos:


    Lcda. Blanca Sáez Ortiz
    Lcda. Angel E. Vega Ramos
    Lcda. Esperanza Buxó Castro



Materia: Derecho de Familia – Reconocimiento voluntario materno es el mecanismo disponible para establecer la filiación materna de menores gestados mediante técnicas de subrogación tradicional.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Melissa Pérez Rodríguez

        Peticionaria

          v.

                        CC-2020-0157

Sasha Marie López Rodríguez; Jason J. Ramos López; Luis Antonio Negrón Romero, por sí y en representación del menor E.N.L.

        Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Martínez Torres

En San Juan, Puerto Rico, a 12 de julio de 2022.

En <u>RPR & BJJ Ex parte</u>, <u>infra</u>, resolvimos que el reconocimiento voluntario es el mecanismo para establecer la filiación materna de menores gestados mediante técnicas de subrogación gestacional. Cónsono con esto, ahora resolvemos que ese mecanismo está disponible, igualmente, para la subrogación tradicional. En este caso, por sus particularidades, el procedimiento judicial que validó el reconocimiento voluntario efectuado fue el mecanismo idóneo para la inscripción registral de un menor nacido por subrogación tradicional.

I

**A.   Trámite procesal inicial del pleito**

El Sr. Luis Negrón Romero y la Sra. Melissa Pérez

Rodríguez (matrimonio Negrón-Pérez), casados entre sí, puertorriqueños y residentes en el estado de Florida, estaban imposibilitados de procrear por razón de una histerectomía total (remoción de órganos reproductivos) que se le realizó a la señora Pérez Rodríguez. Ante el deseo de la pareja de tener hijos, la hermana de vínculo sencillo por vía materna de la señora Pérez Rodríguez, la Sra. Sasha López Rodríguez, les planteó la posibilidad de gestar una criatura para ellos. La señora López Rodríguez, quien está casada con el Sr. Jason J. Ramos López (matrimonio Ramos-López), ofreció someterse a un procedimiento de reproducción asistida de maternidad subrogada tradicional.

Así las cosas, el 30 de septiembre de 2015 la señora López Rodríguez suscribió un documento titulado *Consentimiento, exoneración y relevo de responsabilidad por donante para el uso de sus óvulos*. Ap. del certiorari, pág. 687. En este, accedió a que le extrajeran sus óvulos para que luego de fertilizados, se transfirieran a su útero, con el propósito de engendrar en ella una criatura. Además de prestar su consentimiento para someterse a los procesos médicos de rigor para la extracción y donación de óvulos, el documento consignaba la siguiente renuncia de derechos de la donante:

> Renuncia de Derechos de la DONANTE – Por la presente para siempre renuncio a todo y/o cualquier derecho legal, moral, filosófico, patrimonial, filial, de custodia, sentimental, emocional, y/o Divino que pudiese tener sobre las MUESTRAS y/o sobre la criatura humana que tales MUESTRAS pudiesen engendrar en el futuro y, por ende, por y para siempre renuncio reclamar tales posibles derechos, tanto contra el EQUIPO IN-VITRO, así como contra los últimos usuarios de

las MUESTRAS. Renuncio además a jamás requerir la identidad de la DONATARIA en quien se utilizarán las MUESTRAS, ni la identidad de los últimos usuarios de las MUESTRAS, si la DONATARIA ha expresado mantener su identidad confidencial y secreta de toda persona. Íd., pág. 688

Una vez realizada la extracción de los óvulos, el matrimonio Negrón-Pérez firmó un *Consentimiento para fertilización in-vitro*, en el que dispuso que mediante un proceso de fertilización in vitro, se fusionarían los gametos masculinos del señor Negrón Romero con los óvulos donados por la señora López Rodríguez. Este documento lo firmó la señora López Rodríguez en calidad de testigo.

Posteriormente, la señora López Rodríguez suscribió un *Consentimiento, exoneración y relevo de responsabilidad por recipiente de embriones, gestadora o madre subrogada tradicional*, en el que accedió a que la sometieran a tratamientos médicos con el propósito de salir embarazada y gestar una criatura para otra persona. Los esposos Negrón-Pérez firmaron este documento como padres intencionales. En este, se reiteró el propósito de que la criatura fuera engendrada con espermatozoides del señor Negrón Romero y los óvulos de la señora López Rodríguez (quien también lo gestaría en su vientre) para ser reconocido y entregado al matrimonio Negrón-Pérez.

El inciso G del documento establecía que "[e]s un consentimiento médico y no pretende ser un acuerdo legal entre la MADRE SUBROGADA TRADICIONAL y/o GESTADORA, y el PADRE y la MADRE INTENCIONAL." Ap. del certiorari, pág.

690. Ahora bien, en el último párrafo del documento se expresó que la madre subrogada tradicional renunciaba a

> [t]odo y/o cualquier derecho legal, moral, filosófico, patrimonial, filial, de custodia, sentimental, emocional y/o Divino que pudiese tener sobre los embriones o las criaturas humanas engendradas y/o nacidas y, por ende, renuncio para siempre [a] reclamar tales posibles derechos, tanto contra el EQUIPO IN-VITRO, as[í] como contra los PADRES INTENCIONALES". Íd., pág. 691.

Luego del procedimiento de reproducción asistida, el menor E.N. nació el 29 de junio de 2016. Este fue entregado al matrimonio Negrón-Pérez y permaneció bajo su custodia con el consentimiento de todas las partes. Días después, el matrimonio Negrón-Pérez suscribió una declaración jurada en la que ambos reconocieron voluntariamente al menor E.N. como hijo suyo. Entre otras cosas, expresaron:

> […]3. Esta declaración jurada es una expresa fidedigna que reconoce con la firme voluntad de realizarlo, de forma auténtica y fehaciente, el reconocimiento de [E.N.] como nuestro hijo, al que hemos tenido bajo nuestra protección y cuidado desde su nacimiento y al que reconocemos como nuestro hijo natural.
> […]
> 5. Que hacemos este reconocimiento de forma voluntaria como lo dispone el Código Civil de Puerto Rico, según enmendado, en su Artículo 125 (31 LPRA sec. 504); Ramos v. Rosario, 67 D.P.R. 683 (1947). Íd., pág. 692

Posteriormente, el matrimonio Negrón-Pérez acudió al Registro Demográfico y solicitó que se inscribiera al menor E.N. como su hijo con los apellidos Negrón Pérez. Sin embargo, la entonces directora del Registro Demográfico concluyó que solamente era válido el reconocimiento voluntario paterno. Expresó que la declaración jurada no

era suficiente para que se perfeccionara el reconocimiento voluntario materno. Por tal motivo, procedió a inscribir al menor con los dos apellidos del padre.

Inconforme, el matrimonio Negrón-Pérez instó ante el Tribunal de Primera Instancia una *Petición urgente de mandamus* en la que solicitaron que se ordenara al Registro Demográfico a inscribir al menor con los apellidos de ambos. Por su parte, el Estado presentó una *Moción de desestimación* en la que alegó que el Registro Demográfico se encontraba impedido de inscribir al menor según la petición y que no había un deber ministerial que cumplir. Por tanto, adujo que el mandamus no era el remedio adecuado. Se basó en que en Puerto Rico no existía regulación sobre la maternidad subrogada. Sin embargo, puntualizó que si se llevaban a cabo actos conducentes a la adopción del menor por parte de la señora Pérez Rodríguez, podían obtener un certificado de nacimiento del que surgieran como padres tanto ella como su esposo.

Entonces, el foro primario celebró una vista en la que comparecieron los matrimonios Negrón-Pérez y Ramos-López. Estos últimos intervinieron en calidad de testigos y declararon sobre el acuerdo entre las partes. Así, bajo juramento, la señora López Rodríguez expresó que su intención siempre fue y continuaba siendo, que el menor pasara a ser hijo del matrimonio Negrón-Pérez. Además, sostuvo que nunca tuvo, ni tenía la intención de hacerse

cargo de la custodia del menor, ni de ser reconocida como su madre jurídica, pues lo consideraba su sobrino.

Así las cosas, el Tribunal de Primera Instancia ordenó al Registro Demográfico a aceptar el reconocimiento voluntario de la señora Pérez Rodríguez como la madre del menor, e inscribir al menor con los apellidos de ambos padres intencionales. En desacuerdo, la Oficina del Procurador General presentó un recurso apelativo ante el Tribunal de Apelaciones. Expresó que el único remedio que tenía la señora Pérez Rodríguez era la adopción.

El matrimonio Negrón-Pérez se opuso. Sin embargo, mientras el trámite apelativo se encontraba pendiente, el matrimonio Negrón-Pérez, que residía en el estado de Florida, comenzó a atravesar problemas matrimoniales que culminaron en un divorcio. Entonces, el señor Negrón Romero, sin el consentimiento de la señora Pérez Rodríguez, extrajo al menor E.N. de la jurisdicción de Florida y lo trasladó a Puerto Rico. Como consecuencia, surgieron controversias en torno a la custodia del menor que fueron atendidas por un tribunal en el estado de Florida.

Sucesivamente, mientras se encontraba pendiente el trámite apelativo, la señora López Rodríguez presentó una *Urgente Solicitud de Intervención por ser la madre biológica del menor*. Adujo que tenía un genuino interés en el asunto objeto del litigio y que se oponía a la inscripción ordenada, por entender que el Registro Demográfico actuó conforme a nuestro ordenamiento jurídico,

al denegar la inscripción de una mujer que no es la madre biológica del menor. Asimismo, distinto a lo testificado en la vista de _mandamus,_ adujo que fue coaccionada por la señora Pérez Rodríguez para que renunciara al menor, por lo que solicitó la revocación del dictamen impugnado.

De igual forma, el señor Negrón Romero presentó una solicitud de desistimiento de la reclamación pendiente. Indicó que adoptaba en su totalidad la posición del Estado y solicitó la revocación de la sentencia del Tribunal de Primera Instancia. Así, sostuvo que era incorrecto inscribir al menor como hijo de la señora Pérez Rodríguez, ya que ella no es la madre biológica del menor. No obstante, esta solicitud fue denegada.

Entonces, el Tribunal de Apelaciones revocó la determinación del foro primario. Fundamentó su decisión en que procedía la desestimación del pleito, sin perjuicio, por falta de parte indispensable, pues no se incluyeron como partes a la señora López Rodríguez ni a su esposo, sino que estos comparecieron en calidad de testigos.

Inconforme, la señora Pérez Rodríguez acudió ante este Tribunal para que revisara esa determinación, pero denegamos el recurso.

**B.    Tracto procesal de este recurso**

El 25 de enero de 2017, el señor Negrón Romero y la señora López Rodríguez demandaron a la señora Pérez Rodríguez ante el Tribunal de Primera Instancia. Solicitaron que se privara a esta última de la custodia del

menor. De igual forma, acudieron al Registro Demográfico para que el menor fuera inscrito como hijo de la señora López Rodríguez, su madre biológica. Entonces, el Registro Demográfico expidió un certificado de nacimiento para el menor E.N., en el que la señora López Rodríguez figuraba como madre.

Más tarde, el señor Negrón Romero junto a la señora López Rodríguez (madre biológica), instaron una petición de custodia compartida por estipulación, que les fue adjudicada según solicitada. En desacuerdo, la señora Pérez Rodríguez (madre intencional) presentó una moción de relevo de sentencia que fue declarada no ha lugar. Por otro lado, el tribunal de Florida se declaró sin jurisdicción para considerar la controversia de filiación y custodia del menor E.N.

A raíz de lo anterior, la señora Pérez Rodríguez instó una *Demanda de sentencia declaratoria y petición urgente de remedio provisional* contra la señora López Rodríguez y los señores Ramos López y Negrón Romero. Esto tenía el fin de que se le reconocieran sus derechos como madre intencional. En la demanda, impugnó la determinación del Registro Demográfico que le vedaba de la posibilidad de reconocer voluntariamente al menor E.N. Alegó que esta decisión estaba basada exclusivamente en su sexo y por tanto era inconstitucional. Así, expresó que el Art. 113 del Código Civil de 1930, 31 LPRA sec. 461, entonces vigente, era inconstitucional porque, a su entender, contemplaba que un

hombre reconociera como hijo a un menor, a sabiendas de que no es su hijo biológico y, sin embargo, le negaba esa posibilidad a una mujer. Además, indicó que no estaba en controversia la capacidad legal de la señora López Rodríguez y que esta nunca quiso que se le asignara la filiación materna. Además, arguyó que las declaraciones juradas prestadas eran suficientes para que se validara su reconocimiento voluntario en el Registro Demográfico. Finalmente, suplicó que se rectificara el certificado de nacimiento del menor -donde figuraba el apellido de la madre biológica (señora López Rodríguez)- para que reflejara su apellido y que se tomaran las medidas necesarias para iniciar la transferencia de la custodia.

Entretanto, el Estado, en representación del Registro Demográfico, compareció de manera especial al amparo de la Regla 21.3 de Procedimiento Civil, 32 LPRA Ap. V, toda vez que, en la acción civil, la peticionaria impugnó la constitucionalidad de una disposición del entonces vigente Código Civil de 1930. La Oficina del Procurador General instó al tribunal a autolimitar su intervención y a evadir la cuestión constitucional, pues, según su parecer, la legislación del Registro Demográfico bastaba para la resolución de la controversia. Planteó que el estado de derecho permite que una mujer reconozca voluntariamente a un menor y que así se inscriba en el Registro Demográfico, al presentar la documentación requerida, tal como una declaración jurada.

En su contestación a la demanda, la señora López Rodríguez aceptó que su intención inicial era ceder la criatura como hijo del entonces matrimonio Negrón-Pérez. Sin embargo, narró que la señora Pérez Rodríguez cambió su conducta y suspendió todo tipo de comunicación con ella. Indicó que reconoció al menor E.N. porque era su derecho como madre biológica. Como defensa afirmativa, expresó que el acuerdo que invocó la señora Pérez Rodríguez era inmoral y contrario al bien público.

Por su parte, el señor Negrón Romero adujo que los documentos suscritos eran únicamente consentimientos médicos y que no constituían un compromiso de entrega del menor. Expuso que la acción de su exesposa, la señora Pérez Rodríguez, madre intencional de la criatura, era cosa juzgada y planteó que esta carecía de legitimación activa ya que no cumplía con lo dispuesto en los Arts. 113 y 115 del entonces vigente Código Civil de 1930, 31 LPRA secs. 461 y 463.

Más adelante, la señora Pérez Rodríguez (madre intencional) presentó una *Moción de Sentencia Sumaria* y solicitó que el caso se resolviera según la postura que el Estado presentó. En síntesis, planteó que según el Art. 31 de la Ley del Registro Demográfico, infra, una mujer puede reconocer voluntariamente a un menor por medio de una declaración jurada y que esto era suficiente para proceder con la inscripción. Explicó que tan pronto reconoció al menor, mediante declaración jurada, se convirtió, para

todos los fines legales pertinentes, en su madre jurídica. Por ende, adujo que el funcionario del Registro Demográfico no tenía discreción para negarse a inscribir su reconocimiento voluntario.

Por su parte, la señora López Rodríguez (madre biológica) manifestó que nunca se negó a reconocer al menor y que tampoco fue orientada sobre el proceso de inscripción que los exesposos llevaron a cabo. El señor Negrón Romero afirmó que dada la conducta de la señora Pérez Rodríguez (madre intencional), en alegada contravención a los intereses del menor, apoyó la determinación de la señora López Rodríguez de desistir a la renuncia de los derechos que ostentaba. Así pues, decidió ejercer sus derechos de patria potestad y custodia compartida junto a la madre biológica y gestante del menor E.N. Por tal motivo, solicitó que se desestimara la solicitud de la señora Pérez Rodríguez.

Entonces, el foro primario concluyó que bastaba con la declaración jurada para que la señora Pérez Rodríguez pudiera reconocer al menor. Además, entendió que la señora López Rodríguez -madre biológica- renunció a sus derechos sobre el menor. Por eso, ordenó al Registro Demográfico a inscribir al menor con los apellidos de sus padres intencionales. Además, le impuso al señor Negrón Romero y a la señora López Rodríguez el pago de $5,000 por concepto de honorarios y costas, al determinar que actuaron temerariamente.

En desacuerdo, el señor Negrón Romero presentó un recurso de <u>apelación</u> ante el foro apelativo intermedio. De igual forma, el matrimonio Ramos-López instó otro recurso apelativo que fue consolidado con el primero. Estos alegaron que el Tribunal de Primera Instancia erró al declarar que la madre intencional, señora Pérez Rodríguez, era la madre registral del menor. También, arguyeron que ese foro erró al determinar que existió un contrato de maternidad subrogada e imponerles honorarios de abogado. El 7 de febrero de 2020, el Tribunal de Apelaciones revocó al foro primario. Razonó que la Sentencia apelada era contraria a derecho. Así, expresó que permanecía inalterado el certificado de nacimiento del menor E.N. con los apellidos de sus padres biológicos.

Inconforme, la madre intencional, señora Pérez Rodríguez, compareció ante nos mediante escrito de <u>certiorari</u>. Esbozó que el Tribunal de Apelaciones erró al considerar la apelación del señor Negrón Romero. A su entender, ese foro no tenía jurisdicción porque el señor Negrón Romero cuestionó la filiación materna en su capacidad personal. A su vez, planteó que se determinó que solo los hombres, y no las mujeres, tienen derecho a reconocer voluntariamente a un menor y que eso contraviene la prohibición constitucional de discrimen por razón de sexo. Además, alegó que el Tribunal de Apelaciones erró al aplicar las disposiciones legales referentes a la adopción.

Por último, arguyó que se erró al revocar la determinación del pago de honorarios de abogado por temeridad.

Expedido el auto y con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

II

Como primer señalamiento de error, la madre intencional (señora Pérez Rodríguez) arguyó que el padre (señor Negrón Romero) carecía de legitimación para cuestionar, en su capacidad personal, la determinación judicial que adjudicó la filiación materna del menor E.N. Adicionalmente arguyó que esto nos dejaba sin jurisdicción para atender los planteamientos que él esbozó. No le asiste la razón.

Los asuntos relacionados con la jurisdicción de un tribunal son privilegiados y deben atenderse con preeminencia. Allied Mgmt. Grp., Inc. v. Oriental Bank, 204 DPR 386 (2020). La jurisdicción de un tribunal consiste en el poder que tiene para atender y decidir casos y controversias. Íd.; Peerless Oil v. Hnos. Torres Pérez, 186 DPR 239, 249 (2012); S.L.G. Solá-Moreno v. Bengoa Becerra, 182 DPR 675, 682 (2011). La ausencia de esta no es susceptible de ser subsanada, por lo que una sentencia dictada por un tribunal sin jurisdicción es nula e inexistente en derecho. Allied Mgmt. Grp., Inc. v. Oriental Bank, supra; Cruz Padilla v. Depto. Vivienda, 184 DPR 393, 403 (2012). Por eso, cada foro adjudicativo tiene el deber de examinar su propia jurisdicción y la del foro de donde

procede el recurso que tiene ante sí. Allied Mgmt. Grp., Inc. v. Oriental Bank, supra; Peerless Oil v. Hnos. Torres Pérez, supra; S.L.G. Szendrey-Ramos v. F. Castillo, 169 DPR 873, 883 (2007).

De igual forma, la legitimación que posee una parte merece consideración prioritaria. La legitimación activa de una parte reside en su capacidad para realizar con eficacia actos procesales como litigante. Lozada Tirado et al. v. Testigos de Jehová, 177 DPR 893 (2010). Esta presupone capacidad para demandar y la tenencia de un interés legítimo en la controversia. Col. Ópticos de P.R. v. Vani Visual Center, 124 DPR 559, 563 (1989). El propósito de la legitimación activa es que el tribunal se asegure de que: el reclamante tiene un interés genuino; va a perseguir su causa vigorosamente, y que todos los asuntos pertinentes serán colocados ante la consideración del tribunal. Muns. Aguada y Aguadilla v. JCA, 190 DPR 122, 132 (2014).

Los menores no emancipados carecen de capacidad para obrar, pero pueden comparecer y ser parte de un litigio si son representados por quienes ostentan su patria potestad o tutela. Bonilla Ramos v. Dávila Medina, 185 DPR 667, 678 (2012); Álvareztorre Muñiz v. Sorani Jiménez, 175 DPR 398, 425 (2009). Particularmente, en las acciones de impugnación de filiación, aunque se demanda a quien ostenta la patria potestad del menor, este último es la parte realmente perjudicada. Bonilla Ramos v. Dávila Medina, supra. En ese sentido, ya que el estado civil del menor puede verse

perjudicado, corresponde que este sea representado por el padre con patria potestad o por conducto de un defensor judicial si se estima que entre ellos hay intereses encontrados. <u>Rivera Marrero v. Santiago Martínez</u>, 203 DPR 462 (2019). Incluso el derogado Art. 115 del Código Civil de 1930, 31 LPRA sec. 463, reconoce que el presunto padre puede impugnar la maternidad de un menor.

Del expediente surge que la señora Pérez Rodríguez incluyó en su reclamación al señor Negrón Romero en su capacidad personal y como representante de su hijo menor de edad, porque este es el padre biológico del menor y ostenta su patria potestad. Como consecuencia, aun cuando la filiación paterna no está en controversia, el señor Negrón Romero ostentaba legitimación para instar el recurso apelativo en representación del menor E.N., la parte incluida y realmente perjudicada en el pleito de filiación materna. No nos convence el argumento de que el señor Negrón Romero carecía de legitimación debido a que, en algunas mociones, en la parte correspondiente a la comparecencia, no incluyó que acudía "por sí y en representación del menor E.N.". De los escritos que obran en autos surge que tanto el menor E.N. como el señor Negrón Romero fueron parte en los procedimientos y que este último compareció en ambas capacidades: por sí y en representación del menor. Por ende, el primer señalamiento de error no se cometió.

III

El segundo señalamiento de error exige que contestemos la interrogante de si el mecanismo de reconocimiento voluntario —como medio para establecer la filiación— está disponible para que a una mujer se le atribuya la maternidad jurídica de un menor nacido mediante técnicas de subrogación tradicional. Contestamos en la afirmativa.[1]

Cuando hablamos de la figura de la filiación, nos referimos a la relación jurídica procedente del vínculo entre padres e hijos. Rivera Marrero v. Santiago Martínez, supra, pág. 476. En ese sentido, esta "sintetiza el conjunto de relaciones jurídicas, que determinadas por la paternidad y la maternidad, vinculan a los padres [y a las madres] con los hijos dentro de la familia". RPR & BJJ Ex parte, 207 DPR 389, 410 (2021). Véase, además, Sánchez v. Sánchez, 154 DPR 645, 660 (2001).

Es menester señalar que, debido a que la relación biológica no siempre coincide con la relación jurídica, la filiación en su concepto más amplio denota el estado que se le asigna a una persona dentro de una familia por haber sido engendrada en ella o ser parte como resultado de una adopción o de otro hecho legalmente suficiente en derecho. Castro v. Negrón, 159 DPR 568, 579-580 (2003). Véase: Peña Bernaldo de Quirós, Derecho de familia, Madrid, Sección de

---

[1] Adviértase que, como los hechos de este caso se originaron bajo la vigencia del derogado Código Civil de 1930, haremos referencia a este cuerpo normativo debido a que es el aplicable para disponer de la controversia.

Publicaciones, Facultad de Derecho, Universidad Complutense, 1989, págs. 402-403.

Como se percibe, el vínculo biológico es insuficiente por sí mismo para que nazca el vínculo jurídico filiatorio. Álvareztorre Muñiz v. Sorani Jiménez, supra, pág. 411. Por eso, cuando no conste quiénes son los padres de una persona puede darse una filiación biológica pero no jurídica. También puede darse el caso de que quien figura como padre jurídico no lo sea biológicamente.

A tales efectos, hemos reconocido que existen dos tipos de filiaciones: la natural y la adoptiva. AAR, Ex parte, 187 DPR 835, 856 (2013); Beníquez et al. v. Vargas et al., 184 DPR 210, 228 (2012). En lo pertinente a la controversia ante nos, en la filiación natural se encuentran subsumidos dos medios para establecer la filiación: (a) el reconocimiento voluntario, y (b) el reconocimiento forzoso, el cual se materializa como consecuencia de un decreto judicial.[2] Véase: Beníquez et al. v. Vargas et. al., supra, págs. 228-231.

El reconocimiento voluntario es aquel acto jurídico que consiste en una "declaración hecha por ambos padres (o por uno de ellos aisladamente), por cuya virtud acreditan que una persona es hijo o hija suya, siempre que ello se haga

---

[2] El reconocimiento forzoso se refiere a aquel reconocimiento declarado mediante dictamen judicial que toma como base el hecho filiatorio. Beníquez et al. v. Vargas et al., 184 DPR 210, 231 (2012). Véase: R.E. Ortega-Vélez, La filiación: apuntes y jurisprudencia, San Juan, Ed. Scisco, 1997, pág. 44.

en las condiciones y mediante las formas prescritas por las leyes". RPR & BJJ Ex parte, supra, págs. 416-417. Véase, González Rosado v. Echevarría Muñiz, 169 DPR 554, 563 (2006) (citando a F. Puig Peña, Compendio de Derecho Civil Español, Madrid, Ed. Pirámide, Vol. V, pág. 394). **Queda al margen la cuestión de si hay vínculo biológico entre el reconocido y el reconocedor**. Almodóvar v. Mendez Román, 125 DPR 218, 250 (1990). Sin embargo, es posible impugnar el reconocimiento voluntario por su inexactitud con la realidad biológica. Mayol v. Torres, 164 DPR 517 (2005).

En nuestro ordenamiento, la base jurídica del reconocimiento voluntario es el Código Civil. Véase, Art. 125 del Código Civil de 1930 (derogado), 31 LPRA sec. 504. El acto de reconocimiento voluntario se caracteriza por ser individual, personalísimo, unilateral, formal, puro e irrevocable. Álvareztorre Muñiz v. Sorani Jiménez, supra, págs. 412-413. En Almodóvar v. Mendez Román, supra, pág. 236 (citando a Albaladejo, Curso de derecho civil, 2da ed., Barcelona, Ed. Bosch, 1984, T. IV, pág. 226), enunciamos, al aludir a la figura del reconocimiento voluntario, que "[l]as personas que carecen de filiación conocida paterna o materna o de ambas, pasan a ostentar una u otra o las dos cuando los reconoce un varón, una mujer o una pareja".

**Recientemente, en RPR & BJJ Ex Parte, supra, reafirmamos que una mujer puede reconocer voluntariamente**

**a una persona para así considerarla como su hijo o hija.**
Incluso, enunciamos que la Ley del Registro Demográfico -
legislación que, entre otros asuntos, procesalmente
instrumenta el reconocimiento voluntario-, permite tal
proceder. Íd., pág. 417.[3] Cónsono con esto, la Ley del
Registro Demográfico también dispone, en su Art. 31, que:

> [C]uando el reconocimiento de un hijo natural se
> hiciere en documento público o en una declaración
> jurada bastará la presentación de dicho documento
> o declaración para que el encargado del Registro
> Demográfico proceda a inscribir el mismo, y a ese
> efecto, se llenará el correspondiente certificado
> de inscripción; Disponiéndose, además, que en
> caso de que el nacimiento de tal hijo hubiera
> sido previamente inscrito se llevará al
> certificado los datos adicionales que resulten de
> tal reconocimiento[…]. 24 LPRA sec. 1231.

Tras realizar un ejercicio hermenéutico del articulado
de Código Civil de 1930 y de la Ley del Registro Demográfico
sobre la procedencia del reconocimiento voluntario por
parte de una mujer, en RPR & BJJ Ex Parte, supra, pautamos
que el reconocimiento voluntario es el mecanismo para
establecer la filiación materna de forma directa para los
menores gestados mediante subrogación gestacional, cuando

---

[3] En particular, el Artículo 19-A de la Ley del Registro Demográfico
reza:

> Si el nacimiento es reconocido por uno solo de los padres
> será obligación del Registro Demográfico, cuando así lo
> requiera dicho padre o madre al momento de la inscripción,
> realizar la inscripción haciendo constar los dos apellidos
> del único que lo reconoce.

> Si con posterioridad a la inscripción surgiera la intención
> de un **reconocimiento voluntario, el Registro Demográfico
> viene en la obligación de sustituir el apellido del padre
> o la madre** de acuerdo [con] la documentación evidenciada.
> 24 LPRA sec. 1133a. (Énfasis suplido). Véase, además, RPR
> & BJJ Ex parte, supra, pág. 417.

la mujer gestante no está vinculada genéticamente con el menor.[4] También aclaramos que, para que ello sea así, el menor no puede tener un estado filiatorio anterior o contradictorio al pretendido por el reconocimiento. Íd., pág. 418.

Hoy aplicamos ese razonamiento a la controversia de autos. De esta forma, **instauramos la norma de que el reconocimiento voluntario materno es el mecanismo disponible para establecer la filiación materna de menores gestados mediante técnicas de subrogación tradicional. Es decir, por medio de este mecanismo la madre intencional del menor puede convertirse en su madre jurídica.**

En el trasfondo fáctico de la controversia ante nos, la señora Pérez Rodríguez alegó que el señor Negrón Romero fue inscrito como padre jurídico, por el mero hecho de que reconoció al menor E.N. mediante una declaración jurada, pero que a ella se le negó esa vía para ser inscrita como madre jurídica. El Tribunal de Apelaciones señaló que nada impide que una mujer pueda reconocer voluntariamente a su hijo mediante la presentación de una declaración jurada u otra evidencia documental. Sin embargo, puntualizó que esa inscripción procede si la reconocedora es quien dio a luz al niño, o en la alternativa, quien lo adoptó. Esta conclusión se basa principalmente en la presunción de

---

[4] Para ello, bastará que se manifieste tal reconocimiento voluntario en una declaración jurada y esta se presente ante el Registro Demográfico, en cumplimiento con las formalidades que establece la Ley del Registro Demográfico.

maternidad contenida en el derogado Art. 113 del Código Civil de 1930, 31 LPRA sec. 461.

Según expusimos, las disposiciones de la ley del Registro Demográfico así como las del Código Civil de 1930 contemplan el reconocimiento voluntario materno. Al interpretar tales disposiciones, en RPR & BJJ Ex parte, supra, págs. 432-433, este Tribunal adoptó la teoría de que el mecanismo para establecer la filiación original debe ser el menos oneroso posible. En ese caso, el Tribunal le dio especial énfasis a que el reconocimiento voluntario se hizo antes de que el nacimiento del menor fuese inscrito a nombre de la mujer que le dio a luz. También, el Tribunal razonó que la controversia trataba sobre la inscripción registral por reconocimiento al amparo del derogado Art. 125 del Código Civil de 1930, supra, antes de que se diera otra declaración, informe o inscripción en el Registro Demográfico. RPR & BJJ Ex parte, supra, pág. 435. Aunque allí nos referimos específicamente al reconocimiento voluntario cuando la mujer gestante no tiene vínculo genético con el menor, se abundó en que:

> desde 1942, a pesar de la presunción de filiación matrimonial del artículo 113 del derogado Código Civil, era posible que dos hombres inscribieran a un menor como hijo suyo, pero prevalecía como padre quien primero lo inscribiera en el Registro Demográfico hasta tanto la presunción o el reconocimiento voluntario fuera impugnado con éxito en el tribunal por inexactitud con la realidad biológica. Así, no vemos razón para que al amparo del artículo 19-A de la Ley del Registro Demográfico, y por el principio constitucional de igualdad, rechacemos esa posibilidad respecto a la mujer. Lo que hoy pautamos responde a principios de orden constitucional que no podemos

obviar y elimina uno de los últimos reductos de discrimen sobre la mujer en materia filiatoria. Íd., pág. 433.

En RPR & BJJ Ex parte, supra, esta Curia expresó que llegó a su determinación tras aplicar las disposiciones del derogado Código Civil de 1930. En ese sentido, el Código Civil de 1930 no contenía un pronunciamiento específico para la maternidad subrogada. Tampoco distinguía entre los tipos de maternidad subrogada. Por eso, no encontramos precepto legal que impidiera que se aplicara el reconocimiento voluntario bajo el derogado Art. 125 del Código Civil de 1930, supra, a la maternidad subrogada gestacional.

En este caso, al momento en que la madre intencional, la señora Pérez Rodríguez, presentó la declaración jurada en el Registro para inscribir su reconocimiento voluntario, no había otra inscripción que estuviera en conflicto con su pretensión, por lo que podía ser inscrita válidamente.[5] No obstante, el Registro denegó la inscripción y la señora Pérez Rodríguez se vio obligada a acudir al foro judicial para solicitar que fuera inscrita como la madre jurídica del menor E.N. **Procede, pues, que se corrijan las constancias del Registro de modo que se anule la inscripción hecha por la señora López Rodríguez y, en cambio, se le dé cabida a la realizada por la señora Pérez Rodríguez.** Debe

---

[5] Fue posterior a este suceso que la señora López Rodríguez, como gestante del menor, le solicitó al Registro –de manera improcedente y en contra de las representaciones que le hizo a la señora Pérez Rodríguez– que la inscribiera como su madre, lo que ocurrió.

quedar meridianamente claro que esto es lo procedente en derecho, además la señora López Rodríguez (madre biológica) testificó bajo juramento –en el pleito de <u>mandamus</u>- que su intención era que la señora Pérez Rodríguez fuera la madre del menor.

IV

El tercer señalamiento de error nos lleva a un análisis de dos partes. Primero debemos contestar la interrogante de si los actos, declaraciones y los acuerdos suscritos por la señora López Rodríguez perfeccionaron una renuncia a los derechos que ostentaba sobre el menor E.N., quien es su hijo genético y a quien dio a luz. De contestar afirmativamente, debemos evaluar en segundo lugar si el Tribunal de Apelaciones incidió al aplicar las disposiciones legales referentes a adopción.

-A-

Para propósitos de la primera cuestión, conviene esbozar que la presunción de maternidad por razón de parto, recogida en el Artículo 113 del Código Civil de 1930 (derogado), <u>supra</u>, no es irrebatible. **Como bien esta Curia reconoció en <u>RPR & BJJ Ex Parte</u>, <u>supra</u>, pág. 413, es posible que, tras recibir cualquier prueba idónea y concluyente, el tribunal descarte la presunción de maternidad de la mujer que alumbró al menor.**

Esto es relevante porque la señora López Rodríguez pretende, esencialmente, ampararse en esa presunción del parto –además de su vínculo biológico con el menor— para

que se le considere la madre jurídica del menor. Como se expondrá detalladamente a continuación, **la realidad ineludible es que esa presunción quedó derrotada, pues los actos y manifestaciones de la señora López Rodríguez, unidos a los acuerdos que suscribió, indudablemente evidenciaron su renuncia a los derechos maternales.** Incluso, entre la señora Pérez Rodríguez y la señora López Rodríguez se perfeccionó un contrato de maternidad subrogada. Veamos.

No hay duda de que existe un contrato cuando concurren los elementos de consentimiento, objeto y causa. Art. 1213 del Código Civil de 1930 (derogado), 31 LPRA sec. 3391. Específicamente, los contratos se perfeccionan con el mero consentimiento -concurso de la oferta y la aceptación- y desde entonces las partes involucradas quedan obligadas a las condiciones y los términos pactados. Arts. 1210 y 1214 del Código Civil de 1930 (derogado), 31 LPRA secs. 3375 y 3401. Como norma general, estos serán obligatorios sin importar la forma en que se celebraron, si concurren las condiciones esenciales para su validez. Art. 1230 del Código Civil de 1930 (derogado), 31 LPRA sec. 3451.

En ocasiones no es posible determinar la voluntad de los contratantes al meramente revisitar los términos de lo pactado. Por ello, en tal circunstancia será necesario tomar en cuenta sus actos anteriores, coetáneos y posteriores al perfeccionamiento del acuerdo para constatar la verdadera intención contractual. Art. 1234 del Código

Civil de 1930 (derogado), 31 LPRA sec. 3472. Véase, además, Suárez Figueroa v. Sabanera Real, Inc., 173 DPR 694, 711 (2008); García López v. Méndez García, 102 DPR 383, 394 (1974); Merle v. W. Bend Co., 97 DPR 403, 410 (1969).

En nuestro ordenamiento impera la libertad de contratación. Ello consiste en que los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente. Ahora bien, la autonomía que brinda la libertad de contratación tiene límites. La facultad para contratar no puede ejercerse abusivamente ni en oposición a una disposición legal. Esto es compatible con el principio de que los derechos son renunciables, siempre que la ley no prohíba su renuncia o no sea en perjuicio de tercero. Véanse: Arts. 4 y 1207 del Código Civil de 1930 (derogado), 31 LPRA secs. 4 y 3372. Independientemente del tipo de contrato y de la importancia que este merezca para las partes, si resulta contrario a las leyes, la moral o al orden público, es nulo y, por lo tanto, inexistente. De Jesús González v. A.C., 148 DPR 255, 264 (1999).

El concepto de orden público puede definirse como el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad, que ampara un interés social dominante por los derechos que tiende a proteger. Consejo de Titulares v. C.R.U.V., 132 DPR 707 (1993); Unisys v. Ramallo Brothers, 128 DPR 842 (1991); Hernández v. Méndez & Assoc. Dev. Corp., 105 DPR 149, 153-154 (1976). Por eso, es un medio para conseguir un balance entre la autonomía de

la voluntad y la imprescindible protección del bienestar común. Hernández v. Méndez & Assoc. Dev. Corp., supra, pág. 266. A tales efectos, debido a que este podría ser un concepto difuso que no se limita a la ley vigente, los tribunales deben darle concreción en cada caso. Consejo de Titulares v. C.R.U.V., supra.

La señora Pérez Rodríguez (madre intencional) arguyó que la intervención de la señora López Rodríguez (madre biológica) en la etapa apelativa fue en abierta contradicción a: (1) los acuerdos que antes suscribió, (2) el testimonio que ofreció bajo juramento ante el foro primario, y (3) todos los actos y manifestaciones que hizo por aproximadamente año y medio. Indicó que la manifestación unilateral de la señora López Rodríguez a favor de que se reconociera a E.N. como su hijo es de carácter vinculante. Por otra parte, la contención de la señora López Rodríguez es que no renunció válida ni legalmente a los derechos y obligaciones que le asisten sobre el menor. Insiste en que el procedimiento de adopción y el reconocimiento voluntario materno no son mecanismos optativos a los que se pueda acudir indistintamente y que posteriormente reconoció al menor porque era su derecho como madre biológica.

De entrada, no cabe hablar de que los acuerdos de maternidad subrogada tradicional son inválidos o contrarios a la ley, moral u orden público. En este caso, aunque concluyéramos que los acuerdos firmados son meramente

consentimientos médicos, es forzoso concluir que la señora López Rodríguez renunció en más de una ocasión a los derechos que podrían asistirle.

Como mencionamos, procede validar el reconocimiento voluntario efectuado por la señora Pérez Rodríguez. Esto resulta forzoso, al considerar las actuaciones, expresiones y acuerdos entre las partes. La posibilidad del nacimiento del menor surgió cuando la señora López Rodríguez, por iniciativa propia, le planteó a su hermana, la señora Pérez Rodríguez, que deseaba hacerle un "regalo de amor". Por eso, se suscribieron todos los consentimientos médicos para que se llevara a cabo el proceso de fertilización in vitro. Destacamos que, en el *Consentimiento, exoneración y relevo de responsabilidad por recipiente de embriones, gestadora o madre subrogada tradicional*, la madre biológica, señora López Rodríguez, consignó que sabía que la criatura se engendró y gestó con el **único propósito de que naciera un bebé para que fuera entregado y reconocido por los padres intencionales.**

A tono con lo anterior, durante el embarazo la señora López Rodríguez reiteró que se consideraba tía de la criatura. De hecho, en el procedimiento judicial inicial relacionado con la inscripción del menor, ella voluntariamente y bajo juramento ratificó que no deseaba reconocer al menor. Además, recalcó "[m]i único deseo es que mi hermana tenga ese bebé y su esposo. Es un regalo que le hice yo a mi hermana, nadie me lo pagó, nadie me lo

pidió, nadie me está obligando. Mi único deseo es que ese niño sea de mi hermana". Ap. del certiorari, pág. 575.

No fue hasta que el menor tenía aproximadamente siete meses de nacido que la señora López Rodríguez reconoció al menor como su hijo. Queda claro que esta acción no procedía ya que fue en abierta contradicción con sus actos, declaraciones y renuncia. **Más importante aún, del conjunto de incidencias fácticas dimana que entre las partes se perfeccionó un contrato de maternidad subrogada válido.**

Ciertamente, el contrato en este caso no fue uno convencional, pues no se redujo a escrito. No obstante, además de que los contratos en nuestro ordenamiento pueden ser verbales, los de maternidad subrogada no tienen requisito de forma. Así, de los actos y representaciones de las partes queda claro que se configuró un contrato. Particularmente, la señora López Rodríguez se ofreció a gestar al menor, y evidentemente, la señora Pérez Rodríguez tuvo que aceptar esa oferta para que continuaran los procedimientos reproductivos ulteriores. Es decir, se suscitó un concurso entre la oferta y la aceptación, lo que redundó en el consentimiento de ambas para llevar a efecto lo pactado: la gestación de un menor que, para todos los fines, iba a ser considerado hijo de la señora Pérez Rodríguez. Con este cuadro, se manifestó el consentimiento a que se gestara el menor para que fuera hijo de la señora

Pérez Rodríguez (objeto), y la señora López Rodríguez lo haría por su mera liberalidad (causa).[6]

Por eso, aunque al momento de los hechos no había un procedimiento específico para que la madre intencional pasara a ser la madre legal del menor, concluimos que la señora López Rodríguez, con sus actos anteriores, coetáneos y posteriores al acuerdo evidenció que no sería la madre jurídica del menor que gestó. En este caso, es palmario que la señora López Rodríguez renunció a los derechos que podrían asistirle sobre el menor E.N. Esta renuncia, unida a la autorización judicial de reconocimiento voluntario en este caso incluyó implícitamente cualquier acción futura de impugnación de filiación por inexactitud.

-B-

Los procesos de adopción son un ejemplo de los procedimientos que viabilizan y permiten la renuncia de derechos paternofiliales. La adopción es un "acto jurídico solemne, en el cual luego de una ruptura total del vínculo jurídico existente entre un individuo y sus padres biológicos, se forma una nueva filiación entre este y las personas que han expresado su voluntad para adoptarlo como hijo". AAR, Ex parte, supra, pág. 856. El fin primordial de

---

[6] Dado a la particularidad de la controversia ante nos, es prudente recurrir a las doctrinas de derecho contractual para brindar una solución. No obstante, no nos corresponde dictaminar el contenido de los contratos de maternidad subrogada. La cuestión de cómo estos contratos se regulan en nuestra jurisdicción es una tarea que recae en la Asamblea Legislativa. Independientemente de ello, apuntalamos que, ante lo sensitivo de los intereses involucrados en este tipo de pactos, sería sensato e incluso aconsejable que estos se reduzcan a escrito.

esta figura es el mejor bienestar del menor. Por eso sus procesos están rigurosamente reglamentados. Íd., pág. 857.

El Art. 587 del Código Civil de 2020, 31 LPRA sec. 7188, reconoce que la adopción por decreto final y firme extingue todo vínculo jurídico entre el adoptado y su familia biológica o adoptiva anterior. Por eso, una vez decretada la adopción, el adoptado es considerado para todos los efectos legales como hijo del adoptante. Íd.

La señora Pérez Rodríguez arguyó que el Tribunal de Apelaciones erró al aplicar la figura de adopción a su caso. Este error se cometió. Según expuesto, el proceso de adopción no era un requisito *sine qua non* para que el menor gestado por el mecanismo de subrogación tradicional pasara a ser hijo legal de la señora Pérez Rodríguez.

En RPR & BJJ Ex parte, supra, reconocimos que el mecanismo de adopción es el más oneroso para establecer o sustituir la filiación original de un menor nacido por procreación asistida.

> En tal circunstancia, por principios fundamentales como la intimidad familiar y el derecho del menor a adquirir con prontitud el estado civil para el desarrollo integral de su personalidad en el entorno familiar, el mecanismo para establecer la filiación original debe ser el menos oneroso posible, como lo son el reconocimiento voluntario y la presunción matrimonial estatuida en nuestro Código Civil. Íd., pág. 45.

Cónsono con tal pronunciamiento, es imperativa nuestra intervención en este caso. Debemos imprimirle validez al reconocimiento voluntario que realizó la señora Pérez Rodríguez. Para esto, no es necesario recurrir a la

figura de la adopción. La señora Pérez Rodríguez fue quien, con su voluntad manifiesta, inició el conjunto de eventos que redundaron en el nacimiento del menor. Así, al ser esta la madre intencional, es necesario permitir la inscripción de su filiación, la que evidenció sin ambages en la declaración jurada que presentó ante el Registro.

Recordemos que, al momento del reconocimiento voluntario de la señora Pérez Rodríguez no había un título registral que estableciera una filiación contradictoria que requiera la ruptura por el acto solemne de adopción. Véase: Íd., pág. 44. Según nuestro precedente, en RPR & BJJ Ex parte, supra, en ausencia de un título anterior inscrito que acredite otra filiación, basta con que se presente una declaración jurada ante el Registro Demográfico para hacer valer el reconocimiento voluntario.

En ese sentido, establecemos que ello es igualmente aplicable para la inscripción de la filiación materna de menores gestados mediante técnicas de subrogación tradicional. Ciertamente, como reseñamos, en este caso ese trámite no fue posible ante la acción de la señora López Rodríguez de inscribir al menor como su hijo. Debido a eso, es necesario que, mediante nuestra intervención, las constancias del Registro reflejen la realidad extra registral. A saber, que la señora Pérez Rodríguez reconoció voluntariamente al menor E.N. y que, a causa de este acto, ella es su madre jurídica.

V

Por último, debemos evaluar si la conducta desplegada por los demandantes fue temeraria o frívola. La Regla 44.1(d) de Procedimiento Civil, 32 LPRA Ap. V, regula la concesión de honorarios de abogado. El tribunal impondrá el pago de una suma por este concepto cuando determine que cualquier parte o su abogado actuó temerariamente. Esta determinación es un asunto que descansa en la discreción del tribunal. P.R. Oil v. Dayco, 164 DPR 486, 511 (2005). Sin embargo, si el tribunal entiende que se actuó temerariamente la imposición de honorarios de abogado es mandatoria. Meléndez Vega v. El Vocero de PR, 189 DPR 123, 211 (2013); Jarra Corp. v. Axxis Corp., 155 DPR 764 (2001).

A grandes rasgos, incurre en conducta temeraria una parte que alargue innecesariamente un pleito o que interponga pleitos frívolos que obliguen a la otra parte a incurrir en gastos innecesarios o gestiones evitables. Nieves Huertas et al. v. ELA I, 189 DPR 611, 624 (2013); Domínguez v. GA Life, 157 DPR 690, 706 (2002). Mediante la imposición de estos honorarios se busca penalizar al "[l]itigante perdidoso que, por su obstinación, terquedad, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, los gastos, el trabajo y los inconvenientes de un pleito". P.R. Oil v. Dayco, supra, págs. 511-512.

Debido a que su imposición es un asunto discrecional, los tribunales revisores solo intervendrán cuando surja en tal concesión un claro abuso de discreción. Rodríguez de Oller v. T.O.L.I.C., 171 DPR 293, 312 (2007). A pesar de que el concepto de temeridad es amplio, es improcedente en litigios que encierran planteamientos complejos y novedosos aún no resueltos en nuestra jurisdicción. Gómez Márquez v. El Oriental, 203 DPR 783, 807 (2020); Blanco Matos v. Colón Mulero, 200 DPR 398, 429 (2018); Maderas Tratadas v. Sun Alliance et al., 185 DPR 880 (2012). Asimismo, no se actúa con temeridad si se poseen argumentos para rebatir lo que sostiene la parte contraria. Gómez Márquez v. El Oriental, supra.

La señora Pérez Rodríguez arguyó que el Tribunal de Apelaciones erró al revocar la determinación del foro *a quo* de imponer el pago de honorarios de abogado a raíz de la conducta temeraria desplegada por las otras partes. Planteó que el foro primario determinó la imposición de honorarios de abogado por la conducta de la parte recurrida y no porque se tratara de un asunto novedoso de derecho.

Analizando el caso en su totalidad, es forzoso concluir que las cuestiones planteadas tratan sobre un asunto novedoso de derecho. Además, nuestra determinación demuestra que los argumentos de los recurridos tienen una interpretación plausible. Por ende, no erró el Tribunal de Apelaciones al revocar la concesión de honorarios de abogado.

VI

Nuestra determinación establece un balance entre los variados intereses que matizan esta controversia. En RPR & BJJ Ex parte, supra, atendimos la inscripción registral de un menor nacido por técnicas de reproducción asistida. Allí se tomó en consideración el acuerdo de subrogación, la declaración jurada de la gestante y que esta testificó y ratificó ante el juez su renuncia a los derechos que tenía por razón del parto. Por eso, determinamos que ese tipo de renuncia se puede validar con una autorización judicial en un procedimiento no contencioso. Asimismo, afirmamos que la inscripción directa del reconocimiento voluntario materno era viable -sin necesidad de acudir a un tribunal- si se hacía mediante una declaración jurada, y la inscripción no estaba en conflicto con una anterior.

Hoy, al igual que en aquel entonces, no vemos por qué imponer un proceso distinto al reconocimiento voluntario para que el estado filiatorio del menor advenga final.

Reiteradamente enfatizamos el valor que posee el precedente en nuestro ordenamiento jurídico. Rivera Ruiz v. Mun. De Ponce, 196 DPR 410, 429 (2016). "La doctrina del *stare decisis* establece que, como norma general, un tribunal debe seguir sus decisiones en casos posteriores a fin de lograr estabilidad y certidumbre legal". Com. CNP v. CEE, 197 DPR 914, 922-923 (2017).

Sin embargo, esta doctrina no supone que la opinión del tribunal es un dogma que deba seguirse aun cuando se

convenza posteriormente de que su decisión anterior es errónea y no resiste un análisis cuidadoso. Íd., pág. 923; Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 DPR 365, 391 (2012); Pueblo v. Díaz De León, 176 DPR 913, 922 (2009). Procederá dejar a un lado el precedente solo si: (1) la decisión anterior fue claramente errónea; (2) sus efectos son adversos para el resto del ordenamiento, y (3) una cantidad limitad de personas confió en ella. Rivera Ruiz et al. v. Mun. de Ponce et al., 196 DPR 412, 431 (2016); Pueblo v. Diaz De León, 176 DPR 913, 922 (2009). Aclarado esto, resolvemos que RPR & BJJ Ex parte, supra, es doctrina reciente que debemos seguir, dándole así estabilidad al Derecho.

Por todo lo anterior, concluimos que el reconocimiento voluntario que hizo la señora Pérez Rodríguez con autorización judicial fue suficiente para que esta sea considerada como la madre legal del menor E.N. Entre las partes se perfeccionó un contrato de maternidad subrogada. A tales efectos, la señora López Rodríguez, con sus actos previos y posteriores al embarazo, renunció a los derechos que podrían asistirle por su vínculo genético con el menor. Sus actos tienen consecuencias jurídicas. Su renuncia quedó evidenciada por los acuerdos que suscribió, el testimonio que ofreció bajo juramento ante el foro primario, así como todas las participaciones y manifestaciones que hizo por aproximadamente año y medio. Por eso, se encontraba impedida de posteriormente reconocer al menor E.N.

Siguiendo nuestro precedente, resulta claro que en los casos de maternidad subrogada no es necesario que se complete un proceso de adopción para que el menor sea inscrito a nombre de la madre intencional. En esos casos, indistintamente de si se trata de subrogación gestacional o tradicional, el reconocimiento voluntario de la madre intencional -con el fin de establecer su filiación- se puede practicar mediante una declaración jurada presentada directamente al Registro Demográfico, si la inscripción no está en conflicto con una anterior. Aquí, por los hechos específicos de este caso, bastaba el reconocimiento voluntario sin oposición y con autorización judicial para que el estado filiatorio del menor adviniera final.

Asimismo, no podemos pasar por alto que el menor lleva más de 5 de sus 6 años de vida bajo la custodia compartida de la señora López Rodríguez y el señor Negrón Romero. Tampoco podemos ignorar que la señora Pérez Rodríguez incesantemente ha procurado que el menor E.N. vuelva a su compañía. Por eso, lo relacionado a patria potestad y custodia deberá dilucidarse en el proceso correspondiente de relaciones de familia, con la sensibilidad que el asunto merece y para atender el mejor bienestar del menor.

Por los fundamentos expuestos, se revoca la Sentencia del Tribunal de Apelaciones. Por consiguiente, prevalece la decisión del Tribunal de Primera Instancia y se ordena la inscripción del menor E.N. como hijo de la señora Pérez Rodríguez.

Se dictará Sentencia de Conformidad.


                                          RAFAEL L. MARTÍNEZ TORRES
                                               Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Melissa Pérez Rodríguez

        Peticionaria

                v.

                          CC-2020-0157

Sasha Marie López Rodríguez; Jason J. Ramos López; Luis Antonio Negrón Romero, por sí y en representación del menor E.N.L.

        Recurridos


SENTENCIA


En San Juan, Puerto Rico, a 12 de julio de 2022.


Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca la Sentencia del Tribunal de Apelaciones. Por consiguiente, prevalece la decisión del Tribunal de Primera Instancia y se ordena la inscripción del menor E.N. como hijo de la señora Pérez Rodríguez.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de conformidad a la que se unió el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Colón Pérez emitió una Opinión de conformidad a la que se unió el Juez Asociado señor Estrella Martínez. La Jueza Asociada señora Pabón Charneco emitió una Opinión de conformidad en parte y disidente en parte a la que se unió el Juez Asociado señor Rivera García.


                Javier O. Sepúlveda Rodríguez
              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Melissa Pérez Rodríguez

      Peticionaria

              v.

Sasha Marie López Rodríguez;    CC-2020-0157    *Certiorari*
Jason J. Ramos López; Luis
Antonio Negrón Romero, por sí y
en representación del menor
E.N.L.

      Recurridos

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad a la cual se unió el Juez Asociado señor Estrella Martínez

En San Juan, Puerto Rico, a 12 de julio de 2022.

En esta ocasión, este Tribunal emprendió un rumbo justiciero, sensible y correcto al disponer de la controversia de epígrafe. Debido a que la solución que hoy se brinda es cónsona con lo resuelto en RPR & BJJ Ex parte, infra, y a tono con mi postura en ese precedente, estoy conforme con la decisión mayoritaria. De esta forma, abonamos a la certeza y a la estabilidad en un área del Derecho de Familia que adolece de un vacío regulatorio que, de conformidad con nuestro rol constitucional de dirimir casos y controversias, nos corresponde suplir. Así, nuestro ordenamiento jurídico alcanza a las nuevas realidades científicas, en particular, a las técnicas de

reproducción asistida, las cuales, como vemos, tienen un impacto en la esfera del Derecho. Hoy pautamos que el reconocimiento voluntario es el mecanismo disponible para establecer la filiación materna de un menor nacido mediante subrogación tradicional. Con este proceder, validamos la voluntad clara de la madre intencional y le imprimimos obligatoriedad a los acuerdos que esta perfeccionó junto con la mujer gestante para dar vida a su hijo. Así, reafirmamos que es a través de este trámite —y no mediante la adopción— que la madre intencional —quien, con su acto volitivo inició la cadena de eventos que redundaron en el nacimiento del menor— puede lograr la validez de un vínculo jurídico con este.

Dado a que el trasfondo fáctico de este caso yace certeramente en la Opinión Mayoritaria, me doy a la tarea de exponer una serie de cuestiones neurálgicas sobre esta materia.

I

**A. La subrogación como técnica de reproducción asistida**

Como punto de partida, es menester señalar que, entre las técnicas de reproducción asistida reconocidas y practicadas, se encuentra la subrogación.[1] Esta, a su vez, se divide en dos categorías: la gestacional y la tradicional.[2] En la subrogación gestacional se implantan los gametos

---

[1] Joseph F. Morrissey, Surrogacy: The Process, the Law, and the Contracts, 51 WILLAMETTE L. REV. 459 (2015).
[2] Íd.

masculinos en la mujer gestante mediante fertilización *in vitro*.[3] En este escenario, el óvulo puede pertenecer a la madre intencional o a una donante, pero no a la gestante, y el esperma al padre intencional o a un donante.[4] En el caso en que el óvulo provenga de una donante, la madre genética, la gestante y la comitente, son tres personas diferentes. En esta última configuración, ni la madre intencional ni la mujer gestante guardan vínculo genético con el embrión.

Con base en el panorama anterior se resolvió la controversia en RPR & BJJ Ex parte, 207 DPR 389 (2021). Allí, un matrimonio recurrió a la subrogación gestacional con el fin de tener un hijo propio debido a que la madre intencional tenía dificultades reproductivas. En específico, este acordó con la mujer gestante que les portara el embarazo de una criatura, cuyo embrión estaría formado por los espermatozoides del padre intencional y el óvulo de una donante anónima. El menor no tendría vínculo genético con la madre intencional ni con la mujer gestante.

Una vez nació el menor, surgió la disputa sobre cómo la madre intencional podría vincularse jurídicamente con este, sin tener que recurrir a un proceso adoptivo. Por un lado, la

---

[3] Glenda Labadie-Jackson, Los derechos reproductivos de las latinas y los acuerdos comerciales de maternidad subrogada, 14 TEX. HISP. J. L. & POL'Y 29, 34 (2008).

Cabe aclarar que, en esta disciplina, cuando se menciona a la madre o al padre intencional —también se les conoce como madre o padre comitente—, son aquellas personas que entablaron un acuerdo con una tercera persona para que les gestara una criatura que, cuando naciera, les fuera entregada. Esto, para que la criatura sea considerada, para todos los efectos, como hijo o hija de los padres intencionales. Véase: Isis Ramos, Madres subrogadas: un método de adopción temprana, 3 REV. CLAVE, REV. ESTUDIOS CRÍTICOS DER. 233, 236 (2008).
[4] Véase: Labadie-Jackson, supra, pág. 34.

madre intencional tenía a su haber el acuerdo que suscribió con la mujer gestante para llevar el embarazo a término y entregarle el menor una vez ocurriera el alumbramiento, y el hecho de que esta última no tenía vínculo genético con el menor. Por el otro, contaba con una declaración jurada de la mujer gestante en la que renunciaba a todo derecho que podría tener sobre el menor. Asimismo, la madre intencional debía enfrentarse a la presunción de maternidad por razón de parto recogida en el Artículo 113 del Código Civil de 1930, 31 LPRA ant. sec. 461.

Trabada así la controversia, le correspondía al Tribunal General de Justicia resolverla. Cuando esta Curia la atendió, para rebatir la referida presunción imperante en nuestro ordenamiento, dictaminamos que esta era controvertible tras recibirse cualquier prueba idónea y concluyente a tal efecto. RPR & BJJ Ex parte, supra.[5] De esta forma, y luego de reconocer que nuestro Derecho de Familia y Derecho Registral Civil permitía el **reconocimiento voluntario materno**, establecimos que mediante el procedimiento judicial de reconocimiento voluntario que allí se originó la madre intencional podría lograr su filiación. Ello, claro está, si a satisfacción del juzgador aportaba la prueba necesaria para derrotar la presunción prescrita y manifestaba su intención inequívoca de

---

[5] Sépase que, en ese caso, uno de los elementos probatorios que pesó para así entender rebatida la presunción fue que la mujer gestante, además de no tener vínculo genético con la criatura, había renunciado voluntariamente a los derechos y responsabilidades que surgieran por razón del parto. Véase: RPR & BJJ Ex parte, 207 DPR 389, 398-400 (2021).

reconocer voluntariamente al menor como su hijo. Íd.[6] Es importante destacar que la decisión se fundamentó principalmente en lo resuelto en Ocasio v. Díaz, 88 DPR 676 (1963), por lo que se reiteró y se le dio "plena vigencia al axioma constitucional que prohíbe el discrimen por razón de nacimiento y proclamó la igualdad y dignidad del ser humano en materia filiatoria […]". RPR & BJJ Ex parte, supra, págs. 411-412.

Obsérvese que en esa controversia —al igual que en la del recurso de epígrafe— eran de aplicación las disposiciones del Código Civil de 1930 y, a base estas, resolvimos. No obstante, en RPR & BJJ Ex parte, supra, sirvieron como fuente persuasiva e ilustrativa las nuevas disposiciones del Código Civil de Puerto Rico de 2020 sobre filiación. 31 LPRA sec. 5311 et seq. Ciertamente, el articulado de este cuerpo normativo denota un cambio de paradigma —anclado en concepciones modernas— vis a vis la cosmovisión decimonónica que permeaba en la legislación civil anterior.

En particular, el Código Civil de 2020 reconoce que: (a) la filiación puede tener lugar por métodos de reproducción asistida; (b) una declaración judicial del estado filiatorio no hará pronunciamiento sobre las circunstancias del nacimiento o el estado civil de los progenitores; (c) la filiación puede establecerse con cualquier prueba admisible

---

[6] Es menester aclarar que, en sí, para el perfeccionamiento del reconocimiento voluntario, como regla general, no es necesaria la intervención judicial. Dada la naturaleza y particularidad de la controversia que atendimos en ese recurso, fue necesario que el Tribunal General de Justicia validara el reconocimiento voluntario que efectuó la madre intencional.

en un tribunal conforme a las Reglas de Evidencia; (d) la presunción de maternidad por razón de parto contiene una excepción en los casos de maternidad subrogada en los cuales la mujer gestante no tiene vínculo genético alguno con el hijo que se desprende de su vientre y desde un principio su intención original fue llevar el embarazo a término para otra persona; (e) esta presunción admite prueba en contrario (se preceptúa expresamente), y (f) que la maternidad puede impugnarse por la existencia de un acuerdo de maternidad subrogada y la madre intencional está legitimada a realizar tal impugnación. Artículos 556, 564-565, 567, 569-570, 31 LPRA secs. 7102, 7114-7115, 7121, 7123-7124.

Ahora bien, el caso de epígrafe planteó una situación distinta al tratarse de **subrogación tradicional.** En esta categoría, la mujer gestante aporta el óvulo y es quien gesta al menor.[7] Usualmente, los gametos masculinos utilizados son los del padre intencional.[8] Lo que la distingue principalmente de la gestacional es que mientras la madre intencional no tiene vínculo genético con el embrión, la mujer gestante sí.[9] Ese es, precisamente, el cuadro al que nos enfrentamos en la presente controversia.

Vemos, nuevamente, cómo la madre intencional se confronta con una barrera para filiar jurídicamente con una criatura que, **si no hubiese sido por su deseo manifiesto e**

---

[7] Elizabeth Nicholson, Protecting the Alabama Surrogate: A Legislative Solution, 69 ALA. L. REV. 701, 703 (2018).
[8] Íd.
[9] Íd.

**intención, no se hubiese concebido.** Sin importar su carencia de conexión genética, ella descansó en los acuerdos que suscribió con la mujer gestante y en las representaciones que esta le hizo. Además, la madre intencional tenía un interés genuino de que, al recurrir a esta técnica de reproducción asistida —por su situación reproductiva—, **el menor nacido iba a ser su hijo para todos los efectos, tanto jurídicos como sociales.** Así, no podíamos resolver esta controversia de otro modo que no fuera la más cabal y justa posible.

En virtud de ello, la mayoría razonó que —al igual que en RPR & BJJ Ex parte, supra— la filiación mediante reconocimiento voluntario estaba al alcance de la madre intencional, incluso en circunstancias donde el menor se concibió mediante subrogación tradicional. Para ello convergieron dos aspectos importantes. Primero, la posibilidad del reconocimiento voluntario materno, según lo permitían el Código Civil de 1930 y la legislación registral civil. Segundo, que la presunción de maternidad por razón de parto podía controvertirse. Consecuentemente, al aplicar estos postulados al caso, se coligió que: (a) la madre intencional se había convertido en la madre jurídica del menor E.N.L. tras reconocerlo voluntariamente —sin que, **al momento de tal reconocimiento,** existiera en el Registro Demográfico un título anterior oficialmente inscrito que acreditara otra filiación—, y (b) se derrotó la presunción de maternidad por razón de parto, pues los actos, acuerdos y manifestaciones de la  mujer gestante eran indicativos de que renunció a todo

derecho habido sobre el menor y lo gestó con el único fin de entregarlo a la madre intencional.

Aclarado el alcance de nuestra decisión, conviene discutir brevemente —por ser en extremo pertinente— la naturaleza de los acuerdos de maternidad subrogada.

**B. Acuerdos de maternidad subrogada**

Al aproximarme a este tema, resulta necesario mencionar que considero atinada la utilización de la doctrina del derecho de contratos en el caso de epígrafe. Como bien se formuló en el dictamen mayoritario, entre la Sra. Melissa Pérez Rodríguez y la Sra. Sasha Marie López Rodríguez se perfeccionó, inequívocamente, un acuerdo de maternidad subrogada.[10]

Ante todo, es imperativo enunciar lo siguiente: los acuerdos de maternidad subrogada son contratos —como cualquier otro, pero con sus particularidades— que, una vez estén presentes los elementos necesarios para su validez, son vinculantes entre las partes contratantes.[11] En este se consignan los términos y condiciones por los cuales se regirá la relación entre la madre y el padre intencional, y la mujer gestante.[12]

Primeramente, es necesario proveer una definición de este acuerdo. De manera general, es aquel:

---

[10] Si bien en este acápite se hace referencia a las disposiciones sobre derecho contractual del Código Civil de 1930 —por ser el aplicable a la controversia—, el articulado análogo del Código Civil de 2020 conduce al mismo análisis.
[11] Morrissey, supra, pág. 515.
[12] Íd.

> [Por] medio del cual una mujer acepta quedar embarazada mediante un[a] [técnica de reproducción asistida] [-ya sea a través de un]procedimiento de inseminación artificial, [fertilización *in vitro*, u otro-], para que luego, una vez que se produzca el nacimiento del bebé, lo entregue […] [a los padres intencionales], renunciando para ello a los derechos que la ley le confiere sobre el recién nacido, y en contraprestación, [como] regla general, [recibe][e]l pago de una compensación, generalmente consistente en una suma de dinero.[13]

Adicionalmente, estos contratos pueden clasificarse entre altruistas y comerciales.[14] Los primeros "a menudo ocurren entre amistades cercanas o familiares y la [mujer gestante] no recibe compensación alguna más allá de lo razonablemente necesario para cubrir el cuidado médico".[15] Los segundos son aquellos en los que la mujer gestante "sí recibe un pago como contraprestación de las obligaciones derivadas del contrato, pago que puede consistir, no solamente en una suma de dinero, sino también en la entrega de objetos, servicios o cualquier otra cosa de valor pecuniario".[16]

En diversas jurisdicciones —estadounidenses y extranjeras— se han regulado estos acuerdos mediante

---

[13] Camilo A. Rodríguez-Yong & Karol X. Martínez-Muñoz, El contrato de maternidad subrogada: La experiencia estadounidense. *Revista de derecho (Valdivia)*, *25*(2), pág. 63 (2012). Esta definición, aunque genérica, tiene el propósito de dar un atisbo sobre este tipo de contratos y su trascendencia. Según se expuso, estos pueden establecerse para las distintas categorías de subrogación.

[14] Íd.

[15] Lily Johnson, Commercial Surrogacy Is the Sale of Children?: An Argument That Commercial Surrogacy Does Not Violate International Treaties, 28 WASH. INT'L L.J. 701, 704-705 (2019) (Traducción suplida).

[16] Rodríguez-Yong & Martínez-Muñoz, supra, pág. 64 (citando a Hugh V. McLachlan & J. Kim Swales, Commercial Surrogate Motherhood and the Alleged Commodification of Children: A Defense of Legally Enforceable Contracts, 72 *Law and Contemporary Problems* 91, 92 (2009)).

legislación o jurisprudencia, o ambos.[17] En otras —como en

Puerto Rico—, no existe reglamentación específica alguna.

Ciertamente, en donde sí hay pronunciamientos al respecto,

los acuerdos deberán regirse por los parámetros allí

establecidos.[18] En muchas instancias, estos suelen tener un

contenido *pro forma.*[19]

---

[17] Morrissey, supra.

[18] Valga señalar que, en los Estados Unidos, no hay un acercamiento uniforme entre los estados en cuanto a la validez de los contratos de maternidad subrogada. Algunos estados prohíben categóricamente este tipo de acuerdos, mientras otros los permiten con ciertas condiciones y limitaciones. Véase: Margaret Ryznar, International Commercial Surrogacy and Its Parties, 43 J. Marshall L. Rev. 1009, 1013–14 (2010). También, la proscripción dependerá de si se trata de un acuerdo comercial o altruista. Asimismo, de si tiene que ver con un acuerdo de subrogación gestacional o tradicional. A tal efecto, se ha esbozado que:

> States can either declare surrogacy contracts enforceable, void and unenforceable, or enforceable only if noncommercial.
>
> Some state legislatures, however, have entirely abstained from action, leaving the matter to the courts. Other state legislatures have been active on the subject. Nevada, New Hampshire, and Virginia, [among others], for example, have statutorily permitted the enforceability of surrogacy contracts […]. [Florida &] Illinois permits both surrogacy contracts and reasonable compensation. On the other hand, many jurisdictions have attempted, with varying degrees of success, to legislatively prohibit the enforcement of surrogacy contracts entirely, whether by banning or voiding them. This group includes Arizona […], Indiana […], Michigan [and] Nebraska. Íd.

[19] Frecuentemente, los acuerdos de maternidad subrogada incorporan las cláusulas siguientes:

(a) Cláusulas expositivas donde se identifican detalladamente a las partes contratantes y la capacidad en la que comparecen.

(b) Cláusulas en las que los padres intencionales y la mujer gestante convienen someterse a exámenes y pruebas médicas con el fin de establecer su aptitud para los procedimientos ulteriores. Asimismo, acuerdan compartirse información al respecto. A base de los resultados, se determina si se continúa con el próximo paso o si se da por terminado el acuerdo.

(c) Cláusulas sobre procedimientos médicos en sí para que la mujer gestante quede embarazada (por ejemplo, la transferencia de los embriones, el embarazo y el proceso de gestación). Aquí, la mujer gestante acuerda someterse a

A pesar de lo anterior, es necesario examinar los acuerdos de maternidad subrogada al amparo de la teoría general de los contratos de Puerto Rico. En nuestro ordenamiento, los contratos son otra de las fuentes de las obligaciones. Artículo 1041 del Código Civil de 1930, 31 LPRA ant. sec. 2992. Estos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Artículo 1206 del Código Civil de 1930, 31 LPRA ant. sec. 3371; Rodríguez Ramos v. E.L.A., 190 DPR 448, 454 (2014). Un contrato nace a la vida jurídica cuando se configuran los siguientes requisitos: (a) consentimiento de los contratantes;(b) objeto cierto que sea materia del contrato, y (c) causa de la obligación que se establezca. Artículo 1213 del Código Civil de 1930, 31 LPRA ant. sec. 3391; Díaz Ayala v. ELA, 153 DPR 675 (2001). Por tanto, una vez concurren las condiciones esenciales para su

---

estos procedimientos. Adicionalmente, los padres intencionales pueden requerirle a la mujer gestante que se abstenga de incurrir en ciertas conductas que pueden poner en riesgo el embarazo.

(d) Cláusulas relativas a quiénes y cómo se tomarán las decisiones médicas durante el embarazo.

(e) Cláusulas sobre el alumbramiento en sí del menor y su separación de la mujer gestante. En este extremo, tanto los padres intencionales como la mujer gestante acuerdan lo relativo a los derechos parentales sobre el menor. Específicamente, los padres intencionales afirman su reconocimiento de su responsabilidad parental y la asunción de la custodia. También, la mujer gestante se obliga a que ni ella ni su pareja ejercerán derechos parentales algunos sobre el menor ni ostentarán su custodia. **Esta sección constituye una de las partes medulares del acuerdo.**

(f) Cláusulas sobre la compensación de la mujer gestante, de haber alguna.

Morrissey, supra, págs. 515-538

validez, estos son obligatorios y tienen fuerza de ley entre las partes contratantes. Artículos 1044 y 1230 del Código Civil de 1930, 31 LPRA ant. secs. 2994 & 3451.

A su vez, cuando examinamos cada uno de los requisitos, es norma establecida que el consentimiento se manifiesta por el concurso de la oferta y la aceptación sobre la cosa y la causa que ha de constituir el contrato. Artículo 1214 del Código Civil de 1930, 31 LPRA ant. sec. 3401. Prods. Tommy Muñiz v. COPAN, 113 DPR 517, 521 (1982). Por otro lado, en cuanto al objeto, el Código Civil de 1930 dispone que pueden ser objeto de los contratos aquellos servicios que no sean contrarios a la ley o las buenas costumbres. Artículo 1223 del Código Civil de 1930, 31 LPRA ant. sec. 3421. No podrán ser objeto de contrato las cosas o servicios imposibles. Íd. La imposibilidad de proporcionar determinada cosa o de prestar algún servicio, significa que la obligación no podrá existir por no ser de posible ejecución. José Puig Brutau, Compendio de Derecho Civil, Vol. II, BOSH, Casa Editorial, S.A., Barcelona, pág. 198.

Sobre la causa, el Código Civil preceptúa que, "[e]n los contratos onerosos se entiende por causa, para cada parte contratante, la prestación o promesa de una cosa o servicio por la otra parte; en los remuneratorios, el servicio o beneficio que se remunera, y en los de pura beneficencia, la mera liberalidad del bienhechor". Artículo 1226 del Código Civil de 1930, 31 LPRA ant. sec. 3431. Concretamente, la causa es "el 'por qué' de la existencia del acto, su razón de ser,

el fin determinante, la justificación o fundamento de la declaración de voluntad".[20]

Es doctrina firme en nuestro derecho contractual que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Artículo 1207 del Código Civil de 1930, 31 LPRA ant. sec. 3372. Esta norma reconoce el doble postulado de la teoría general de la contratación que rige localmente: de un lado, la libertad de contratación, de otro, la total autonomía de la voluntad de los contratantes que han escogido obligarse mutuamente para determinar el contenido de dicha relación jurídica. Es decir, una vez los contratantes eligen pactar entre sí, pueden pautar el contenido y el alcance normativo de su relación jurídica, sin otra intromisión del Estado que la impuesta por los parámetros de la ley, la moral social y el orden público. Un extenso desarrollo jurisprudencial ratifica la vigencia de estos principios esenciales. Véanse: Rodríguez García v. Universidad Carlos Albizu, Inc., 200 DPR 929, 943 (2018); Coop. Sabaneña v. Casiano Rivera, 184 DPR 169, 173-174 (2011); Luan Inv. Corp. v. Rexach Const. Co., 152 DPR 652, 659 (2000); Umpierre v. Torres Díaz, 114 DPR 449, 459 (1983); Hernández v. Méndez & Assoc. Dev. Corp., 105 DPR 149, 153 (1976).

---

[20] Norma Juanes, La causa del contrato, *Revista de la Facultad De Derecho*, *3*(1), Universidad Nacional de Córdoba, Argentina, pág. 42.

Al evaluar un acuerdo de maternidad subrogada a través del crisol de estos lineamientos, **claramente este tiene cabida en nuestro ordenamiento.** Los padres intencionales y la mujer gestante deben estipular el alcance y contenido de su relación jurídica, y consentir a esta. Igualmente, el acuerdo tiene como objeto evidente la gestación de una criatura para que, cuando nazca, sea entregado a los padres intencionales y, así, estos ejerzan sobre este todos los derechos parentales. Sobre la causa, se puede apuntalar que los acuerdos que son comerciales son onerosos, pues la madre intencional gesta al bebé a cambio de una contraprestación. Por su parte, aquellos que son altruistas tiene como causa la mera liberalidad. Lo esbozado es cónsono con las doctrinas jurídicas reseñadas.

Además, los acuerdos de maternidad subrogada no están prohibidos y en el Código Civil de 2020 se hace un reconocimiento expreso de estos. Véase: Artículo 570 del Código Civil de 2020, 31 LPRA sec. 7124. Ello supone una demostración por parte de la Asamblea Legislativa de su intención de abrir camino a estos negocios jurídicos, los cuales son esenciales para viabilizar la maternidad subrogada como técnica de reproducción asistida.

Con lo expuesto en mente, afirmo que los acuerdos de maternidad subrogada son perfectamente válidos en nuestra jurisdicción y completamente exigibles.[21] Más aún, debido a

---

[21] Es meritorio mencionar también que, en Puerto Rico, los contratos de maternidad subrogada no son contrarios al orden público. Recordemos que el concepto "orden público" se define como el "conjunto de valores

que por virtud de estos se posibilita el uso de las técnicas de reproducción asistida, constituyen **"un vehículo para hacer efectiva la igualdad reproductiva entre parejas fértiles e infértiles, heterosexuales y homosexuales[,]lo cual se ancla en la inviolabilidad de la dignidad y los derechos humanos"**. RPR & BJJ Ex parte, supra, pág. 439 (Opinión de Conformidad de la Jueza Presidenta Oronoz Rodríguez).

### C. Adjudicación con perspectiva de género y el análisis constitucional del principio de igualdad

No puedo finalizar esta labor sin expresarme en cuanto a un tema que considero apremiante. Esta controversia pone de relieve cómo los asuntos de género impactan ineludiblemente la forma en que adjudicamos y disponemos de diversos casos que se nos presentan.[22] En este caso la peticionaria y madre intencional planteó desde un inicio que las disposiciones del Código Civil derogado contravenían la prohibición constitucional de discrimen por razón de sexo pues, a su entender, contemplaba que un hombre reconociera voluntariamente como hijo a un menor, a sabiendas de que no es su hijo biológico y, sin embargo, le negaba esa posibilidad

---

eminentes que guían la existencia y bienestar de una sociedad" y "[e]n gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley". De Jesús González v. A.C., 148 DPR 255, 264 (1999). Cuando la Asamblea Legislativa reconoce una figura jurídica en nuestro ordenamiento, el uso de esta por parte de la ciudadanía no constituye una contravención al orden público. En otras palabras, la maternidad subrogada en Puerto Rico es parte del orden público tal y como reconocimos jurisprudencialmente, y según la Asamblea Legislativa esbozó en su legislación sobre la materia en el Código Civil de Puerto Rico de 2020.

[22] Véase: Equipo Sanjuaneras de la Capital v. Federación Puertorriqueña de Voleibol, 2021 TSPR 143 (Voto particular disidente de la Jueza Presidenta Oronoz Rodríguez) (donde expongo la importancia de la adjudicación con perspectiva de género al abordar controversias donde tal elemento es jurídicamente relevante y preponderante para solucionarlas).

a una mujer. Si bien es cierto que esta presentó planteamientos constitucionales de peso, el tribunal validó que nuestro ordenamiento jurídico permite el reconocimiento voluntario materno. Lamentablemente, el Tribunal de Apelaciones aplicó el raciocinio equivocado, basado en una lectura rígida de las disposiciones del anquilosado Código Civil de 1930, cuya base es claramente de origen patriarcal.

Por ello, precisa realizar unos apuntes sobre la adjudicación con perspectiva de género. Debo mencionar que en este caso es necesario utilizar esta metodología adjudicativa que tiene su base en que "[t]odos los seres humanos nacen libres e iguales en dignidad y derechos y, dotados como están de razón y conciencia, deben comportarse fraternalmente los unos con los otros." Artículo 1 de la Declaración Universal de los Derechos Humanos.[23] Véase: <u>Equipo Sanjuaneras de la Capital v. Federación Puertorriqueña de Voleibol</u>, 2021 TSPR 143 (Voto particular disidente de la Jueza Presidenta Oronoz Rodríguez).

Como bien han señalado diversos autores en esta área, y han adoptado otras cortes supremas:

> El derecho que ha dado sustento a la necesidad de incorporar este método de análisis para los casos en los que el género se configura como un factor determinante en la toma de decisiones, ha sido el de acceso a la justicia en condiciones de igualdad y sin discriminación, el cual permite tutelar y hacer efectivos el resto de derechos a favor de las personas, tales como el derecho a la igualdad y la

---

[23] Tal máxima tiene su equivalente en nuestra Constitución en la Sección 1, Artículo II, que dispone que "[l]a dignidad del ser humano es inviolable." Const. PR, Art. II, Sec. 1, LPRA, Tomo 1.

no discriminación, el de las mujeres a una vida libre de violencia, entre otros. [24]

De ahí la necesidad de replantearse el acercamiento a las distintas dinámicas y situaciones de nuestra sociedad —en nuestro caso, a las controversias legales—, habida cuenta de la pluralidad de realidades que se viven actualmente. Asimismo, no podemos perder de perspectiva que la mujer ha estado históricamente minusvalorada y rezagada frente al hombre; por ello la procedencia de estos nuevos enfoques, **para propender a la igualdad.**[25]

Al analizar la intersección entre la perspectiva de género y la faena adjudicativa judicial, debe notarse que la primera "debe ser utilizad[a] por las personas operadoras de justicia en todos aquellos casos en los que el género puede ocasionar un impacto diferenciado".[26] Por consiguiente, la adjudicación con perspectiva de género implica que el juez o la jueza, en su ejercicio hermenéutico, debe evaluar si, al aplicar la norma al caso concreto:

---

[24] Protocolo para juzgar con perspectiva de género (2020), Suprema Corte de Justicia de la Nación, México, pág. 120, https://www.scjn.gob.mx/derechos-humanos/sites/default/files/protocolos/archivos/2020-11/Protocolo%20para%20juzgar%20con%20perspectiva%20de%20g%C3%A9nero%20%28191120%29.pdf.

[25] Anclados en la perspectiva de género, se puede dar una mirada a un fenómeno que logre:

> (i) [V]isibilizar a las mujeres, sus actividades, sus vidas, sus necesidades específicas y la forma en que contribuyen a la creación de la realidad social[; y (ii)] mostrar cómo y por qué cada fenómeno concreto está atravesado por las relaciones de poder y desigualdad entre los géneros, características de los sistemas patriarcales y androcráticos.
>
> Estela Serret & Jessica Méndez Mercado, Sexo, género y feminismo (2011), Suprema Corte de Justicia de la Nación, México, pág. 40.

[26] Protocolo para juzgar con perspectiva de género, op. cit., pág. 123.

> [P]rovoca una violación directa al derecho de igualdad al introducir impactos diferenciados por razón de género, y si lo hace, entonces, es [su] obligación […] preferir la opción interpretativa que elimine tal discriminación […].[27]

En la controversia ante nos, es palmario que el género es un elemento que resulta esencial para su resolución. Los acuerdos de maternidad subrogada —y la subrogación en sí— siempre involucrarán a mujeres. Dada esa inescapable realidad, el Poder Judicial debe contar con las herramientas para abordar estas disputas de modo que imparta justicia equitativa, completa y verdadera.

Téngase en cuenta que la interrogante que se nos pidió contestar en el recurso de epígrafe trató sobre la filiación **materna** de una criatura nacida mediante subrogación tradicional. Esta, sin duda, ameritó que se le diera una mirada integrada y crítica con el fin de dotar su respuesta de elementos de igualdad, **al ser un asunto que únicamente afecta a las mujeres** (madres intencionales) que aspiran a un vínculo jurídico con su hijo o hija.

Después de todo, el Derecho no puede ser utilizado para invisibilizar estas realidades. Debe aspirarse a que se pueda obtener una igualdad real y no meramente formal.[28] Esto implica reconocer la existencia de diferencias relacionadas con el género de las personas y resolver al amparo de la totalidad de las circunstancias que rodean el caso. Adjudicar con equidad y perspectiva de género es buscar disolver la

---

[27] Íd., págs. 123-124.
[28] Véase: Efrén Rivera Ramos, La igualdad: un enfoque multidimensional, 2000 Rev. Jur. de la Univ. de Palermo 49 (2000) (Argentina).

asimetría sistémica y jurídica a favor de establecer las bases jurisprudenciales de un país realmente igualitario. Ello responde a la imperiosa necesidad de fomentar el derecho fundamental y constitucional a la dignidad humana.

## II

En fin, este Tribunal dio un paso de avanzada. Con este dictamen, desmitificamos las técnicas de reproducción asistida —**en particular, la subrogación**—, abrimos espacio a su utilización jurídicamente certera en nuestra jurisdicción, y aclaramos su repercusión en el Derecho de Familia, en materia de filiación materna. No podía ser de otra manera. El Derecho puertorriqueño es dinámico y lleno de vitalidad y estamos llamados a adjudicar en sintonía a los tiempos que vivimos. Este debe responder a las exigencias que provocan los cambios sociales, culturales y científicos.

Nuestra aspiración como Estado democrático es la búsqueda de la igualdad jurídica real y la protección de la dignidad humana. Nosotros, como miembros de esta Curia, interpretamos los textos legislativos a la luz de la Constitución. No somos intérpretes de una "lengua extinta, ardu[a] de descifrar y referente a asuntos esotéricos", pues lo que interpretamos es el Derecho de manera plenaria. Véase: P.R. Tel. Co. v. Martínez, 114 DPR 328, 350 (1983).

En cuanto a los pormenores de este caso, debíamos otorgar un remedio que fuera cónsono con las relaciones jurídicas que aquí se desarrollaron y con la intención inequívoca de la

madre intencional para traer a la vida al menor. Al así dispensar justicia, damos paso al afianzamiento de nuevos paradigmas en este renglón del Derecho y a la materialización de la igualdad de la mujer.


Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Melissa Pérez Rodríguez | | |
|---|---|---|
| Peticionaria | | |
| v. | CC-2020-0157 | *Certiorari* |
| Sasha Marie López Rodríguez; Jason J. Ramos López; Luis Antonio Negrón Romero, por sí y en representación del menor E.N.L. | | |
| Recurridos | | |

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ a la cual se une el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 12 de julio de 2022.

> "[M]adre es quien desea y quiere ser madre, quien tiene la voluntad procreacional, independientemente de su aporte genético y/o biológico".[1]

Hace unos meses atrás -- en *RPR v. BJJ, Ex parte*, 207 DPR 389 (2021) (Colón Pérez, opinión de conformidad) --, anticipábamos que, al momento de abordar las noveles controversias que subyacen en casos como el de marras, no podíamos adscribirnos a aquella visión socio-jurídica que, con el paso del tiempo, ha ido perdiendo adeptos y que ve solo en el parto, o en el vínculo genético, las únicas instancias que verdaderamente acreditan la maternidad.[2] Hoy nos reafirmamos en ese enunciado. **La maternidad, a raíz de**

---

[1] E. Lamm, *Gestación por sustitución: ni maternidad subrogada ni alquiler de vientres*, Ed. Universitat Barcelona, 2012, pág. 42.

[2] Véase, *RPR & BJJ, Ex parte*, *supra* (Colón Pérez, opinión de conformidad).

**los avances científicos y las técnicas de reproducción asistida -- como lo es la gestación subrogada --, ha dejado de implicar necesariamente una relación de filiación predicada exclusivamente en un reduccionismo genético o biológico, para pasar a construirse sobre un elemento volitivo o, lo que es igual, desde una voluntad procreacional que, insistimos, debe ser protegida.**

Con ello en mente, y en lo relacionado a la causa de epígrafe, este Tribunal tuvo la oportunidad de dirimir, entre otras cosas, si una madre intencional podía reconocer voluntariamente a un menor de edad procreado por subrogación tradicional, para establecer así la filiación materna. Es decir, si ausente el vínculo genético entre la madre intencional y la criatura, el referido reconocimiento voluntario -- mediante determinada declaración jurada -- era suficiente para que el Registro Demográfico de Puerto Rico inscribiese al menor de edad como hijo de esta última; en aquellos escenarios en donde, en dicha instrumentalidad gubernamental, no existiese ninguna inscripción anterior en conflicto.

Al acercarse a dicha controversia, una mayoría de esta Curia -- cónsono con lo recientemente sentenciado en *RPR & BJJ, Ex parte, supra*, donde determinamos que el reconocimiento voluntario es el mecanismo menos oneroso para establecer la filiación de menores gestados mediante técnicas de **subrogación gestacional** -- acertadamente concluye que la Sra. Melissa Pérez Rodríguez (en adelante,

"la señora Pérez Rodríguez"), madre intencional, ante la

ausencia de título anterior que acreditara en el Registro

Demográfico otra filiación, tenía disponible el mecanismo

de reconocimiento voluntario para inscribir al menor E. N.

como su hijo. Menor de edad que fue procreado mediante un

proceso de **subrogación tradicional** en el cual la mujer

gestante también aportó el óvulo, estableciéndose así el

vínculo genético entre éstos.[3] Estamos conformes.

Ahora bien, por entender que la controversia de

epígrafe nos permitía profundizar un poco más sobre algunos

aspectos constitucionales de particular importancia cuando

se trata el tema bajo estudio -- según habíamos adelantado

en *RPR v. BJJ, Ex parte, supra* --, emitimos la presente

---

[3] Conviene recordar que la gestación subrogada es "una forma de reproducción asistida, por medio de la cual una persona, denominada gestante, acuerda con otra persona, o con una pareja, denominadas comitente, gestar un embrión con el fin de que la persona nacida tenga vínculos jurídicos de filiación con la parte comitente". (Cita omitida). S. Vilar González, *La gestación subrogada en España y en el derecho comparado*, Madrid, Ed. Wolters Kluwer España, 2018, pág. 29.

Particularmente, en la subrogación tradicional -- modalidad empleada en el caso de autos --, la persona gestante no tan solo gesta a la criatura, sino que también aporta el material genético. Véase, *RPR & BJJ, Ex parte, supra* (Colón Pérez, opinión de conformidad); A. J. Vela Sánchez, *La maternidad subrogada: estudio ante un reto normativo*, Granada, Ed. Comares, S. L., 2012, pág. 16. **Así, en escenarios como éstos, la madre intencional no tiene una conexión genética con la criatura.** *Íd*. Véase, además, G. Labadie Jackson, *Bioética y Derecho de Familia: acotaciones y clareos de la gravidez subrogada*, 76 Rev. Jur. UPR 1291, 1293 (2007). En consecuencia, indiscutiblemente, **la maternidad ya deja de considerarse una relación de filiación basada en el reduccionismo genético o biológico y se abre paso a la imposición de una realidad no genética, determinada por la contribución del elemento volitivo, es decir, de la intención última de ser madre.** Véase, F. Notrica, F. Cotado & P.J. Curti, *La figura de la gestación por sustitución*, 11 Revista IUS 157 (2017).

Adviértase que, en este tipo de escenario, **"la maternidad no se subroga, sino la gestación, es decir, se gesta para otros. La gestante no tiene voluntad de tener un hijo; lo que hace es justamente gestar para que el otro sea padre o madre. Por ende, se debe dilucidar la división entre maternidad y gestación".** (Énfasis suplido). *Íd.*, pág. 156.

*Opinión de Conformidad*. Y es que, no podemos pasar por alto las importantes ramificaciones de índole constitucional que plantea el presente litigio.

Como es sabido, el Art. II, Sec. 1, de la Constitución del Estado Libre Asociado de Puerto Rico promulga que la dignidad del ser humano es inviolable y que todos los hombres y las mujeres son iguales ante la ley. Art. II, Sec. 1, Const. ELA, LPRA, Tomo I. A tenor con ello, nuestra Ley Suprema prohíbe expresamente el establecimiento de "discrimen alguno por motivo de raza, color, **sexo**, nacimiento, origen o condición social e ideas políticas o religiosas". (Énfasis suplido). *Íd*. Además, dicha sección establece que las leyes formuladas y aplicables en nuestra jurisdicción deberán encarnar este principio de esencial igualdad humana. *Íd*. Véase, J. B. Fuster, *Derechos fundamentales y deberes cívicos de las personas*, Puerto Rico, 2013, pág. 43.

Tanto es así que, de un estudio detenido de la discusión acontecida en la Asamblea Constituyente con relación al Art. II, Sec. 1, de la Constitución del Estado Libre Asociado de Puerto Rico, surge que la Comisión de Carta de Derechos informó que el propósito de esa cláusula fue "fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional". 4 Diario de Sesiones de la Convención Constituyente de Puerto

Rico 2561 (ed. 1961). En ese sentido, el delegado señor Jaime Benítez Rexach, al revelar los cimientos en que se fundó nuestra Carta de Derechos, manifestó que, "además de sentar inicialmente esta base de la igualdad profunda del ser humano —igualdad que trasciende cualquier diferencia, bien sea diferencia biológica, […] ideológica, religiosa, política o cultural— por encima de tales diferencias está el ser humano en su profunda dignidad trascendente". Diario de Sesiones, *supra*, T. 2, pág. 1103.  La dignidad del ser humano es, pues, piedra angular de nuestro ordenamiento constitucional. *Íd.*

Cónsono con el principio previamente ilustrado, es preciso señalar que el Art. II, Sec. 7, de nuestra Ley Suprema consagra el derecho a la igual protección de las leyes.  En específico, la referida disposición constitucional instituye que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1.

**La cláusula de referencia "se activa cuando nos enfrentamos a una legislación o a una acción estadual que crea clasificaciones entre grupos, discriminando a unos frente a otros".** (Énfasis suplido). *Garib Bazaín v. Hosp. Aux. Mutuo et al.*, 204 DPR 601, 689 (2020) (Colón Pérez, opinión disidente); *San Miguel Lorenzana v. E.L.A.*, 134 DPR 405, 424 (1993); *Berberena v. Echegoyen*, 128 DPR 864, 878 (1991). No obstante, ello no exige un trato igual para todos los ciudadanos y todas las ciudadanas, sino que más bien

prohíbe el trato desigual injustificado. *Garib Bazaín v. Hosp. Aux. Mutuo et al.*, *supra* (Colón Pérez, opinión disidente); *Berberena v. Echegoyen*, *supra*; *Zachry International v. Tribunal Superior*, 104 DPR 267, 276-277 (1975).

En ese sentido, se ha dicho que "el problema central que plantea la aplicación de la igual protección de las leyes es el de diseñar normas que permitan al gobierno establecer clasificaciones pero que a la vez protejan a las personas contra desigualdades indebidas o irrazonables u odiosas". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1081. Lo anterior, pues, la igual protección de las leyes encuentra su base constitucional en el principio cardinal de trato similar para personas similarmente situadas. *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1, 70 (2010); *López v. E.L.A.*, 165 DPR 280, 297 (2005); Serrano Geyls, *op. cit.*, págs. 1081-1082.

En consecuencia, cuando los tribunales se enfrenten a clasificaciones sospechosas o que afecten derechos fundamentales, deberán aplicar un análisis de escrutinio estricto o riguroso. *AAR, Ex parte*, 187 DPR 835, 864 (2013); *Domínguez Castro et al. v. E.L.A. I*, *supra*, pág. 73; San *Miguel Lorenzana v. E.L.A.*, *supra*, pág. 425; J. J. Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 816. Especialmente, ese enfoque

estricto se utilizará cuando, por ejemplo, se trate de una **clasificación por razón de sexo** ya que "resulta una clasificación sospechosa, en particular cuando la misma tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros". *Zachry International v. Tribunal Superior*, *supra*, pág. 282.

En esa dirección, al implementar el análisis de escrutinio estricto, se presumirá que la clasificación en cuestión es inconstitucional. *Domínguez Castro et al. v. E.L.A. I*, *supra*, págs. 73-74; San *Miguel Lorenzana v. E.L.A.*, *supra*; *Berberena v. Echegoyen*, *supra*, pág. 879. Para sostener la constitucionalidad de la legislación, actuación o clasificación bajo ataque, es necesario que el Estado demuestre que tiene un interés estatal apremiante que la justifique, que el medio seleccionado para adelantar ese interés está estrechamente relacionado con éste y que no existe una alternativa menos onerosa que no sea la que está bajo análisis para promover o alcanzar el interés involucrado. *AAR, Ex parte*, *supra*, pág. 865; *Domínguez Castro et al. v. E.L.A. I*, *supra*; San *Miguel Lorenzana v. E.L.A.*, *supra*.

Dicho ello, si bien estamos conscientes de la existencia de la norma de autolimitación judicial -- que, como regla general, procura que los planteamientos constitucionales no sean considerados cuando un asunto pueda resolverse mediante un análisis estatutario --, somos

de la opinión que hay determinadas controversias que, por vía de excepción, requieren ser estudiadas desde el crisol de los derechos consagrados en nuestra Ley Suprema.[4] Véase, *Rosario Rodríguez v. Rosselló et al. II*, 207 DPR 870, 876 (2021) (Colón Pérez, voto particular disidente) (Citas omitidas). La controversia que hoy nos ocupa es una de éstas.

Y es que, como parte de este litigio y, a nuestro juicio, correctamente, la señora Pérez Rodríguez -- tras invocar los derechos constitucionales que le asisten -- impugna la presunción de maternidad establecida en el Art. 113 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 461.[5] Tal presunción, en escenarios como el aquí bajo

---

[4] Sobre ello, hemos expresado que:

> Si bien reconocemos que existe una norma de autolimitación judicial que, como regla general, procura que los planteamientos constitucionales no sean abordados cuando una controversia pueda resolverse mediante un análisis estatutario, opinamos que existen determinados asuntos de tan alto interés público que, por vía de excepción, deben mover a este Tribunal, como intérpretes finales de nuestra Carta Magna, a intervenir en estos.
>
> **Recordemos que, con el paso del tiempo, la aplicación automática de la norma de autolimitación judicial, en distintos escenarios, ha perpetuado la indiferencia, la ilegalidad y la injusticia.** (Énfasis suplido). *Rosario Rodríguez v. Rosselló et al. II*, *supra* (Colón Pérez, voto particular disidente).

[5] En lo aquí pertinente, la referida disposición estatutaria dictaba que el parto determinaba la maternidad. 31 LPRA ant. sec. 461. Lo anterior encontraba apoyo en el principio romano *mater semper certa est* el cual suponía la identificación de la maternidad con aquella persona que alumbraba a la criatura, pues hace años era inverosímil plantearse que la mujer que alumbraba no fuera, a su vez, la madre genética; mucho menos la intencional. Véase, M. J. Moro Almaraz, *Aspectos civiles de la inseminación artificial y la fecundación «in vitro»*, Barcelona, Librería Bosch, 1988, pág. 208.

Es menester señalar, además, que la presunción de maternidad a la que hemos hecho referencia encuentra su equivalencia en el Art. 567 del Código Civil de Puerto Rico de 2020, 31 LPRA sec. 7121. Ahora bien, el texto del referido artículo fue enmendado para excluir únicamente

estudio, y previo a las decisiones que ha emitido este Tribunal sobre el particular, se ha entendido que requería que una madre intencional se sometiese al proceso de adopción para que se le reconociese como la madre jurídica de determinada criatura, lo cual tenía el grave efecto de imponer una carga mayor a ésta y revelar un trato totalmente desigual en comparación con el del padre intencional, en el presente caso, también biológico.

Al igual que la señora Pérez Rodríguez, albergamos serias dudas respecto a la constitucionalidad de la mencionada disposición estatutaria; una que, a todas luces, establece una clasificación por razón de sexo. Correspondía, pues, que este Tribunal, en su rol de último intérprete de la Constitución del Estado Libre Asociado de Puerto Rico, pasara juicio sobre lo anterior. Lamentablemente, no se hizo así. Abandonamos una gran oportunidad.

Recordemos que, hasta hace poco tiempo, "las normas existentes para determinar la filiación por naturaleza tenían su fundamento, única y exclusivamente, en la verdad biológica con respecto de la madre, estableciéndose, con respecto del padre, diversos mecanismos jurídicos dirigidos a propiciar la adecuación entre la filiación jurídica y la biológica, que hacía posible investigar la paternidad". S. Vilar González, *La gestación subrogada en España y en el*

---

aquellos casos de subrogación gestacional por lo que la mencionada presunción aún persiste en nuestro ordenamiento jurídico.

*derecho comparado*, Madrid, Ed. Wolters Kluwer España, 2018, pág. 25.

Como bien se advirtió en este milenio por el Juez Asociado señor Estrella Martínez: "En el pasado era imposible desprender el hecho de la gestación y el parto del hecho de la concepción. También era impensable para propósitos de los vínculos de filiación natural desprender el hecho de la gestación del material genético particular de los individuos que formarían la familia inmediata del menor. Pero hoy la realidad es distinta". *AAR, Ex parte*, *supra*, pág. 1087 (Estrella Martínez, opinión disidente).

**Toca, pues, asumirla.**


                                              Ángel Colón Pérez
                                                Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Melissa Pérez Rodríguez<br><br>    Peticionaria<br><br>       v.<br><br>Sasha Marie López Rodríguez; Jason J. Ramos López; Luis Antonio Negrón Romero, por sí y en representación del menor E.N.L.<br><br>    Recurridos | CC-2020-0157 |  |

Opinión de conformidad en parte y disidente en parte emitida por la Jueza Asociada señora Pabón Charneco al cual se une el Juez Asociado señor Rivera García.

En San Juan, Puerto Rico, a 12 de julio de 2022.

Al ponderar detenidamente los asuntos de alto interés público sobre Derecho de Familia que reviste el presente caso, coincido en parte y respetuosamente disiento en parte del curso de acción tomado por la Mayoría de este Tribunal. Nuevamente navego con cautela y sensibilidad por uno los vínculos más íntimos y trascendentales en la humanidad: la filiación materna.

Luego de analizar puntillosamente el presente caso, coincido con la Opinión Mayoritaria en que el padre intencional y biológico ostenta legitimación activa para presentar un recurso judicial en representación del menor E.N. Asimismo, concuerdo en que resulta improcedente la

imposición de honorarios de abogado por temeridad por tratarse de un asunto novel y complejo.

Sin ánimo de obviar la realidad socio jurídica actual que incluye nuevas formas para reconocer el vínculo materno, sostengo que ni el Código Civil de 1930 -cuyo cuerpo normativo estaba vigente al momento de los hechos- ni el ordenamiento vigente permiten a la madre intencional reconocer voluntariamente a un menor en los casos de maternidad subrogada tradicional. Distinto al precedente *RPR & BJJ, ex parte*, infra, en el que estaba involucrada una madre subrogada gestacional y a la que el ordenamiento jurídico vigente le exceptúa expresamente de la presunción de maternidad por parto, este caso versa sobre una madre subrogada tradicional quien alumbra y tiene vínculo genético con el menor nacido. A este último caso la Asamblea Legislativa no le otorgó el mismo tratamiento jurídico. No obstante, ello no implica que la madre intencional queda desprovista de una relación filial con el menor nacido mediante la madre subrogada. Esto es posible mediante la filiación adoptiva ante la insuficiencia de prueba que pueda rebatir que la madre subrogada tradicional alumbró al menor E.N.

Asimismo, dado al alto interés público y social que reviste la doctrina de filiación en Puerto Rico, así como el mejor bienestar del menor, no concuerdo en aplicar la doctrina de declaración unilateral y la doctrina de actos

propios para validar la renuncia de la madre subrogada gestacional. Por ello, disiento.

Debido a que los hechos que dieron génesis a la presente controversia están expuestos correctamente en la Opinión Mayoritaria, procedo a discutir el derecho aplicable y mi postura al respecto. Corresponde atender el segundo y tercer error que trae ante nuestra consideración la madre intencional, esto es: si tiene el derecho al reconocimiento voluntario maternofilial del menor E.N. y si el foro apelativo intermedio incidió al aplicar la Ley de Adopción.

I

A.

La filiación consiste en "el estado civil de una persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción o de otro hecho legalmente suficiente al efecto". *Castro v. Negrón*, 159 DPR 568, 579-580 (2003). La filiación concede derechos y obligaciones a las madres y a los padres con relación a sus hijos, y viceversa. *Rivera Marrero v. Santiago Martínez*, 203 DPR 462, 476 (2019). Por lo cual, la doctrina de filiación ciertamente responde a imperativos de política pública en el Derecho de Familia. *González Rosado v. Echevarría Muñiz*, 169 DPR 554, 561 (2006).

Resulta necesario señalar que al momento en que ocurrieron los hechos del presente caso estaba vigente el Código Civil de 1930. En ese entonces, nuestro ordenamiento

reconocía dos (2) tipos de filiación: la natural y la adoptiva. *Rivera Marrero v. Santiago Martínez,* supra*; A.A.R., Ex parte*, 187 DPR 835, 856 (2013). La filiación natural refleja la realidad biológica entre los padres con el menor. *A.A.R., Ex parte*, supra. Mientras, la filiación adoptiva nace mediante una ruptura total del vínculo jurídico con parentela biológica, de modo que se crea una nueva filiación entre el menor con la persona adoptante. *Beníquez et al. v. Vargas et al.,* 184 DPR 210, 233 (2012). En ese sentido, la filiación puede presentar una realidad biológica que no coincida con la jurídica. Íd., pág. 227. Sin embargo, ambos tipos de filiación producen los mismos derechos y obligaciones entre padres e hijos. *A.R.R., Ex parte*, supra, pág. 857; *Zapata et al. v. Zapata et al.,* 156 DPR 278, 286 (2002).

Nuestro ordenamiento establece tres (3) acciones judiciales respecto a la filiación, estas son: (1) la afirmación de filiación; (2) la acción de impugnación, y (3) la mixta. *Rivera Marrero v. Santiago Martínez,* supra, pág. 477. La afirmación de filiación consiste en un pronunciamiento judicial que determina la filiación de una persona que no tenía. *Álvarez Torre Muñiz v. Sorani Jiménez*, 175 DPR 398, 414 (2009). Por su parte, la acción de impugnación estriba en negar una filiación preexistente. En cambio, en la acción judicial mixta "se busca la declaración de determinada filiación mientras que se niega otra

contradictoria, ambas son interdependientes entre sí". *Rivera Marrero v. Santiago Martínez,* supra.

Respecto a la filiación materna, el Art. 113 del entonces Código Civil, 31 LPRA sec. 461, disponía lo siguiente:

> Se presumen hijos del marido de la mujer casada los nacidos durante el matrimonio y los nacidos antes de los trecientos días siguientes a su disolución. El reconocimiento voluntario crea una presunción de paternidad a favor de reconocedor. **El parto determina la maternidad**. (Énfasis suplido).

En la confección del precitado artículo, se partió de la premisa que "la procreación es de fácil comprobación respecto de la madre, probando el hecho del parto y la identidad del hijo". *Almodóvar v. Méndez Román*, 125 DPR 218, 235 (1990). Previo a que existieran los distintos métodos de reproducción, esta norma está basada en el Derecho Romano *mater semper certa est* ("la madre siempre es conocida"). R. Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada*, San Juan, P.R., 1ra ed., 2002, Vol. II, pág. 957. Cabe mencionar que el Art. 125 del derogado Código Civil, *supra*, disponía que en la filiación extramatrimonial "el hijo puede ser reconocido por el padre o la madre conjuntamente, o por uno solo de ellos, en el acta de nacimiento, o en otro documento público". Particularmente establecía que "la madre estará obligada al reconocimiento del hijo natural cuando pruebe cumplidamente el hecho del parto y la identidad del hijo". *Íd.*

En ese contexto, el Art. 115 del Código Civil de 1930, *supra*, disponía que la filiación materna podía impugnarse en dos (2) supuestos: la primera, por simulación de parto o la segunda, por sustitución inadvertida del menor durante o luego del alumbramiento. Al darse cualquiera de esos escenarios, la presunta madre, la madre biológica, el presunto padre o incluso el hijo tiene legitimación para instar una acción de impugnación de maternidad y reconocer voluntariamente al menor según el Artículo 19-A de la Ley Núm. 24 de 22 de abril de 1931, según enmendada, conocida como Ley del Registro Demográfico de Puerto Rico, 24 LPRA sec. 1133a.

Reitero que la Ley del Registro Demográfico, *supra*, así como el Código Civil de 1930 deben interpretarse en conjunto y no de manera aislada y separada. *RPR & BJJ, Ex parte*, 2021 TSPR 83, pág. 10. Esto pues, el Código Civil es un cuerpo normativo que consigna derechos sustantivos, que posteriormente tiene efectos procesales mediante la Ley del Registro Demográfico, *supra*. La Ley del Registro Demográfico tiene como norte registrar, coleccionar, custodiar, preservar, enmendar y certificar hechos vitales de las personas nacidas en Puerto Rico. Art. 7 de la Ley del Registro Demográfico, *supra*. Esa legislación no concede derechos sustantivos relativos a la doctrina de filiación, sino da publicidad de los datos vitales de las personas, así como su estado civil. *Delgado, Ex parte*, 165 DPR 170, 187 (2005). Por ende, bajo el Código Civil de 1930, de no

impugnarse la relación maternofilial mediante simulación de parto o sustitución inadvertida, se considera que la madre es la que alumbró al menor.

Sin embargo, recientemente una Mayoría de este Tribunal razonó en *RPR & BJJ, Ex parte,* supra, que el reconocimiento voluntario es el mecanismo para establecer el estado filiatorio materno en casos de maternidad subrogada cuando: la mujer gestante **no** tiene **vínculo genético** con el menor; **no** exista un título anterior que **acredite otra filiación**; y desde un principio el propósito fue llevar el embarazo a término para otra persona. Determinó que ello es posible **"tras recibir cualquier prueba idónea y concluyente, el tribunal descarte la presunción de maternidad de la mujer que aparenta tenerla por la presunción que reconocía el parto en el artículo 113 del derogado Código Civil"**. *RPR & BJJ, Ex parte*, supra, pág. 21. Así pues, sostuvo que, en casos de maternidad subrogada gestacional, la madre intencional puede reconocer voluntariamente al menor, aunque no lo alumbró. Esto a tenor con el Código Civil 2020, el cual establece que "[e]l parto determina la maternidad, excepto en casos de maternidad subrogada en los cuales la mujer gestante **no tiene vínculo genético** alguno con el hijo que se desprende de su vientre y desde un principio su intención original fue llevar el embarazo a término para otra persona". (Énfasis suplido) Íd., pág. 30. Véase, además, Art. 567 del Código Civil de 2020, 31 LPRA 7121.

Ahora bien, **"el reconocimiento voluntario no puede ser eficaz en ningún aspecto si está en oposición con un título anterior que acredite otra filiación. Dicho de otro modo, hasta que no se impugne exitosamente en el tribunal la filiación contradictoria registral, no procede el reconocimiento de otra filiación"**. (énfasis suplido) Íd., pág. 27. A la luz de los hechos particulares de ese caso, concluyó:

> En este caso **solo la madre intencional es quien ha ejercido la acción de reconocimiento voluntario ante el tribunal.** La madre biológica, quien donó los óvulos utilizados en la fertilización in vitro, es desconocida, y la presunta madre por razón del parto renunció válidamente a cualquier derecho antes de la inscripción original del nacimiento. Ante esa realidad, **no hay ninguna filiación contradictoria al reconocimiento de la madre intencional, como tampoco existe un vínculo jurídico-familiar del menor con alguna parentela biológica materna conocida que requiera su ruptura por el acto solemne de la adopción"**. (Énfasis suplido) *RPR & BJJ, Ex parte*, 2021 TSPR 83, pág. 45.

De modo que se estableció que el reconocimiento voluntario es el mecanismo para establecer la filiación materna de menores gestados mediante técnicas de subrogación **gestacional, mas no tradicional.**

Una Mayoría de este Tribunal extrapola desacertadamente lo resuelto en *RPR & BJJ, Ex parte,* supra, al presente caso. Resuelve que el reconocimiento voluntario es el mecanismo para establecer el estado filiatorio materno cuando la mujer gestante **tiene vínculo genético.** Además, en el presente caso **existe un título que acredita otra filiación que no ha sido impugnado.** Al considerar el alto interés que reviste estos

asuntos y el mejor bienestar del menor, respetuosamente discrepo.

En *RPR & BJJ, Ex parte,* supra, la madre subrogada gestacional no tenía vínculo genético con el menor que alumbró. Tampoco la madre subrogada gestacional reconoció voluntariamente al menor ni requirió -en ninguna etapa del procedimiento judicial- que se le reconociera como madre natural del menor. En cambio, en el presente caso la madre subrogada tradicional tiene vínculo genético con el menor y acudió al Registro Demográfico para inscribir al menor como su hijo. El Registro Demográfico expidió un certificado de nacimiento para el menor en el que la madre subrogada tradicional figura como su madre natural. De manera que existe una filiación contradictoria al reconocimiento voluntario que desea la madre intencional cuya impugnación no puede realizarse mediante una declaración jurada, sino por un proceso de adopción. Deseo recalcar que:

> "[n]o se cuestiona la capacidad de la madre intencional de proveerle al menor el amor y cuidado que este necesita. Lo que está en cuestionamiento es el procedimiento mediante el cual se crea o reconoce el vínculo jurídico entre esta y el menor. Es decir, se examina si la madre intencional puede reconocer voluntariamente al menor [E.N.] y crear una filiación natural mediante un Acuerdo de Subrogación". *RPR & BJJ, ex parte,* supra, pág. 16.

### B.

Es un hecho innegable que en nuestra jurisdicción las técnicas de reproducción asistida se ejercen desde principios de la década del 1980. *Borrador del Código Civil*

*año 2010*, pág. 405. Ante esa realidad social, se han elaborado contratos de maternidad subrogada donde la madre o el padre intencional pacta con la madre subrogada para que esta geste una criatura para los padres intencionales y renuncie a los derechos que pudiera tener sobre el menor nacido. Véase Surrogate-parenting agreement, *Black's Law Dictionary*, 9th ed., Ed. Bryan A. Garner, 2009, pág. 1583. Ahora bien, existe una distinción entre la madre subrogada gestacional y la madre subrogada tradicional. Íd*.* La madre subrogada tradicional aporta el óvulo, por lo cual está vinculada genéticamente con el menor nacido. Íd. En cambio, la madre subrogada gestacional utiliza el óvulo de una donante, de modo que no tiene vínculo genético con la criatura formada en su vientre. Íd. Ciertamente estos avances tecnológicos se distancian de la realidad jurídica.

En ánimo de salvaguardar los derechos de los concebidos mediante reproducción asistida, la Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico (Comisión) presentó ante la Asamblea Legislativa un borrador en el año 2010 sobre esta materia. Véase *Borrador del Código Civil año 2010*. Mediante este borrador, la Comisión propuso que la presunción sobre maternidad se determine mediante el parto y que:

> "la mujer gestante por cualquier método de reproducción asistida se reputa como madre del hijo así concebido. Si el óvulo implantado en el útero de la mujer gestante le fue dado por otra mujer, la maternidad jurídica del nacido se atenderá según lo dispuesto en el capítulo de este título que regula la procreación humana asistida".
> Íd*.*, págs. 380-381.

Sin embargo, en el Código Civil de 2020 se reconoció que "el parto determina la maternidad, **excepto en los casos de maternidad subrogada en los cuales la mujer gestante no tiene vínculo genético alguno con el hijo que se desprende de su vientre**". (Énfasis suplido) Art. 567 del Código Civil de 2020, 31 LPRA sec. 7121. Actualmente se reconoce la reproducción humana asistida con la intervención de terceros donantes de material genético o mujeres gestantes sin vínculo genético. *Memorial Explicativo del Código Civil 2020*, pág. 522. De manera que la legislatura solo reconoció a la madre subrogada gestacional y dejó en el tintero el reconocimiento de la madre subrogada tradicional. Aunque permaneció silente el reconocimiento voluntario materno mediante la subrogación tradicional, ciertamente el campo jurídico se acercó a los cambios sociales y científicos del Siglo XXI al reconocer el derecho maternofilial mediante la figura de madre subrogada gestacional.

Aparte de lo anterior, la Comisión propuso en el Borrador del Código Civil 2010 un Capítulo dedicado a la regulación de la filiación por procreación asistida en el Libro Segundo del Código Civil. *Borrador del Código Civil año 2010,* pág. 404. Esto tras reconocer que "[l]os avances logrados en los campos científicos y tecnológicos alcanzan proporciones extraordinarias, lo que implica una mayor demanda de sus beneficios y, **por ende, una mayor atención del legislador**". (Énfasis suplido) Íd., pág. 404. Particularmente, en el Capítulo IV se presentó la regulación

la filiación por procreación asistida. Allí, se propuso que "la filiación materna y paterna del nacido por medio de una gestadora se determina por la intención original de las partes, en los casos de subrogación gestacional, por las normas de la filiación natural, y **por las de la filiación adoptiva en los casos de la subrogación tradicional**". (Énfasis suplido) Íd., pág. 440. Es decir, como consecuencia del vínculo genético entre la madre subrogada y el menor nacido, la madre intencional deberá solicitar la determinación de filiación mediante un proceso de adopción. Íd.

A tono con lo propuesto y debido a que en la normativa vigente no surge el reconocimiento voluntario materno mediante la subrogación tradicional, considero que el procedimiento adecuado para que la madre intencional tenga la filiación de un menor nacido mediante la subrogación tradicional es la adopción. Dado al alto interés público y social que reviste la doctrina de filiación en Puerto Rico, así como el mejor bienestar del menor, no concuerdo con el proceder de la Mayoría en aplicar indirectamente la doctrina de declaración unilateral y la doctrina de actos propios a los hechos del presente caso para validar la renuncia de la madre subrogada. "Los tribunales no puede dar a esta extensa y complicada materia la clara orientación y la reglamentación centralizada y de larga duración que se requiere". Serrano Geyls, *op. cit.*, pág. 1246. Más aún sobre asuntos que envuelven cuestiones de política pública y

salvaguarda de los derechos de todas las partes aquí
involucrada. Me parece incorrecto y un tanto forzado que una
Mayoría de este Tribunal concluya que los actos y
manifestaciones de la señora López Rodríguez son evidencia
indudable de su renuncia a sus derechos maternales.

## II

El principio de irretroactividad de las leyes es una
norma que establece que una ley no tendrá efecto retroactivo
a menos que se disponga expresamente. Esta norma ha sido
consignada en el Código Civil de 1930 en su Art. 3, 31 LPRA
sec. 3, así como en el Código Civil de 2020, Art. 9, 31 LPRA
sec. 5323. Consecuentemente, la **excepción** en nuestro
ordenamiento es la retroactividad de las leyes. *Id.* pág.
929. Por tal razón, la intención de los legisladores debe
quedar plasmada de forma tácita o expresa. *Asoc. Maestros
v. Depto. Educación*, 171 DPR 640 (2007). Por tanto,
únicamente procede la retroactividad cuando así se desprenda
de la norma estatutaria. *Díaz Ramos v Matta Irizarry*, 198
DPR 916, 929 (2017). De lo contrario, la ley aplicable a la
causa de acción será la que se encuentre vigente al momento
de la ocurrencia de los hechos.

De esta forma, el principio de irretroactividad busca
salvaguardar la estabilidad jurídica en las causas de
acción. *Díaz Ramos v. Matta Irizarry*, supra. Los tribunales
tienen un deber de tener cuidado a la hora de aplicar
retroactivamente una ley, siempre velando que su aplicación
sea prudente y coherente. *Nieves Cruz v. U.P.R*, 151 DPR 150

(2000). Además, cuando un tribunal tenga dudas si corresponde o no aplicar retroactivamente una ley, lo correcto será no hacerlo, pues prevalece la presunción de irretroactividad.

Ahora bien, en el Derecho de Familia, este Tribunal en el pasado ha aplicado retroactivamente varias legislaciones. En *Ocasio v. Díaz*, 88 DPR 676 (1963), establecimos que, por imperativo constitucional, todos los hijos son iguales en nuestro ordenamiento. No obstante, en el caso de auto no nos encontramos ante una controversia que contravenga algún principio constitucional que amerite la aplicación retroactiva de una norma. Mientras que, en *Vázquez Vélez v. Caro Moreno*, 182 DPR 803 (2011), aplicamos retroactivamente las enmiendas realizadas al Código Civil de 1930, toda vez que así se reflejó de manera tácita en la legislación.

No obstante, el Código Civil de 2020 no contiene una disposición que expresa o tácitamente establezca su aplicación de forma retroactiva. Más aún, el principio de irretroactividad tiene como propósito evitar que los tribunales usurpen los poderes de la Asamblea Legislativa. Nuestra Carta Magna crea tres (3) ramas de gobierno, cada una con responsabilidad diferentes. Art. I, Sec. 2, Const. ELA, LPRA, Tomo I, ed. 2016.; *A.A.R, Ex parte*, supra. Para proteger los poderes y la independencia de cada rama de gobierno se adopta la doctrina de Separación de Poderes. Por tal razón, este Tribunal no debe volver a cruzar las fronteras constitucionales y aplicar retroactivamente una

norma, cuando evidentemente esa no fue la voluntad del Cuerpo Legislativo.

Nuevamente, este Tribunal no solo pretende implantar retroactivamente la norma de maternidad subrogada a hechos que ocurrieron antes de la aprobación del Código Civil de 2020, sino que lo extiende a la **maternidad subrogada tradicional**, la cual no fue contemplada en ningún momento por el Cuerpo Legislativo. Reitero, es mi posición que no procede aplicar retroactivamente el Código Civil de 2020. Me parece incorrecto usar de forma análoga la decisión emitida por este Tribunal en *RPR & BJJ, Ex parte*, supra, ante las diferencias tan marcadas en los hechos del presente caso.

## III

El Art. 1206 del Código Civil de 1930, 31 LPRA sec. 3371, expresa que los contratos existen "desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". De igual forma, el Art. 1207 del Código Civil de 1930, 31 LPRA sec. 3372, establece que las partes contratantes podrán establecer las cláusulas y condiciones que mejor les convenga, siempre y cuando no sean contrarias a las leyes, la moral y el orden público. Conforme a esto, nuestro ordenamiento establece que los contratos se perfeccionan por el mero consentimiento entre las partes. Art. 1210 del Código Civil de 1930, 31 LPRA sec. 3375.

Además del consentimiento, es requerido que un contrato tenga un objeto cierto y una causa para establecer la

obligación. Art. 1213 del Código Civil de 1930, 31 LPRA sec. 3391. Podrá ser objeto de un contrato toda cosa que no esté fuera del comercio de los hombres. Art. 1223 del Código Civil de 1930, 31 LPRA sec. 3421. El objeto del contrato deberá ser siempre una cosa determinada. Mientras que la causa será la prestación o promesa de una cosa o servicio por la otra parte. Asimismo, el consentimiento prestado podrá declararse nulo cuando ocurre por error, violencia, intimidación o dolo. Art. 1217 del Código Civil de 1930, 31 LPRA sec. 3404.

Los acuerdos de maternidad subrogada son cada día más comunes en la jurisdicción de Puerto Rico como en los Estados Unidos. A nivel federal no existe legislación que regule la maternidad subrogada en todas sus vertientes. Daniel Schwartz, *Gestional Surrogacy Contracts: Making a case for adoption of the Uniform Parentage Act*, 33 Wis. J.L. Gender & Soc'y 131, 134 (2018). Por tal razón, el proceso para establecer la filiación en un contrato de subrogación varía según la jurisdicción. *Íd.* pág. 133. Estados como Indiana y Kentucky no permiten los contratos de maternidad subrogada porque han determinado que estos van en contra de la política pública de sus estados. *Íd.* pág. 135.

Por otra parte, el estado de Nueva Jersey, a través de su jurisprudencia, permite los contratos de subrogación sin compensación legal. Sin embargo, la madre subrogada no está obligada por contrato a renunciar a sus derechos de filiación antes del nacimiento. *A.H.W. v. G.H.B.,* 772 A.2d 948, 953 (N.J. Super. Ct. Ch. Div. 2000). Véase también *In re T.J.S.,*

16 A.3d 386, 398 (N.J.Super. Ct. App. Div. 2011) (se establece que la madre que da a luz puede reclamar sus derechos de filiación por razones de orden público, y que el acuerdo de subrogación era válido porque la madre subrogada solo fue compensada por los honorarios relacionados con el nacimiento del niño).

En Massachusetts se determinó que, por razones de orden público, una madre subrogada no estará obligada a conferir su patria potestad a los padres intencionales antes del nacimiento de la criatura, ni podrá recibir pago por sus servicios más allá de los gastos relacionados con el embarazo. *R.R. v. M.H.,* 689 N.E.2d 790, 796 (Mass. 1998). En cuanto al estado de Florida, los contratos de subrogación son válidos, pero los padres intencionales solo pueden pagarle a la madre subrogada los gastos de subsistencia, legales, médicos, psicológicos y psiquiátricos. Fl. Stat. Ann. Sec. 742.15(2)(4) (West 2018).

Otro ejemplo es el estado de Virginia, el cual es más exigente, y requiere autorización judicial para que un contrato de subrogación sea válido. Va. Code Ann. Sec. 20-160(A)-(B) (West 2018). Casi la mitad de los estados, incluyendo a Puerto Rico, carecen de estatutos o jurisprudencia que regule los contratos de maternidad subrogada. P. G. Arshagouni, *Be Fruitful and Multiply, By Other Means, if Necessary: The Time has Come to Recognize and Enforce Gestational Surrogacy Agreements*, 61 Depaul L. Rev. 799, 808 (2012). Por tanto, en estados como Colorado,

Maryland y Minnesota, donde ninguna ley rige los contratos de maternidad subrogada, los tribunales han elegido entre varias opciones al asignar la patria potestad: 1) imponer un tutor para el menor nacido; 2) aplicar las teorías de los contratos, y 3) interpretar el impacto sobre la política pública, entre otros. 33 Wis. J.L. Gender & Soc'y, 139.

La parte peticionaria hace alusión a dos (2) documentos que categoriza como Acuerdo de Subrogación entre la madre subrogada tradicional y los padres intencionales del menor E.N. El primer documento está titulado "*Consentimiento, Exoneración y Relevo de Responsabilidad por Donante para el Uso de Óvulos*". Mientras que el segundo documento se titula "*Consentimiento, Exoneración y Relevo de Responsabilidad por Recipiente de Embriones, Gestadora o Madre Subrogada Tradicional*". Ambos documentos fueron otorgados en la oficina del doctor a cargo de procedimiento clínico de inseminación.

El primer documento fue firmado exclusivamente por la Sra. Sasha López Rodríguez. En síntesis, las cláusulas de este primer documento se centran en informar sobre las pruebas, medicamentos y procedimientos clínicos a los que sería sometida la señora López Rodríguez como parte de la donación de óvulos. No empece a ello, el documento cuenta con una cláusula titulada "*Renuncia de derechos de la DONANTE*". En esta cláusula, la señora López Rodríguez renuncia a "todo y/o cualquier derecho legal, moral, filosófico, patrimonial, filial, de custodia, sentimental,

emocional y/o Divino que pudiese tener sobre las **MUESTRAS. . .**". Por lo antes discutido, es evidente que se trata de un consentimiento médico, firmado por una paciente como parte de un procedimiento clínico para estimular la ovulación y poder donar dichas muestras.

En cuanto al segundo documento, el mismo discute los procedimientos clínicos, el uso de medicamentos, riesgos y posibles resultados de los tratamientos por los que tendría que pasar la señora López Rodríguez. El documento fue firmado no solo por la señora López Rodríguez sino también por los padres intencionales, el señor Luis Negrón Romero y la señora Melissa Pérez Rodríguez. De igual forma, el documento incluía una cláusula de renuncia, en la que la señora López Rodríguez se comprometía a renunciar a "todo y/o cualquier derecho legal, moral, filosófico, patrimonial, filial, de custodia, sentimental, emocional y/o Divino que pudiese tener sobre los embriones o las criaturas humanas engendradas y/o nacidas. . .". No obstante, el documento claramente especifica que su único propósito es que sea utilizado como consentimiento médico y que "**no pretende ser un acuerdo legal** entre la MADRE SUBROGADA TRADICIONAL Y/O GESTACIONAL y el PADRE y la MADRE INTENCIONAL". Nuevamente, es evidente que nos encontramos ante un consentimiento médico que informa a la paciente y a los padres intencionales de los procedimientos clínicos.

Por todo lo antes mencionado, es forzoso concluir que los formularios firmados por la madre subrogada tradicional

y los padres intencionales del menor E.N. no son vinculantes ni tienen fuerza contractual alguna entre las partes. Los formularios constituyen un mero consentimiento médico entre la paciente, la señora López Rodríguez, y el doctor a cargo de los procedimientos clínicos. Aunque en el caso particular de la maternidad subrogada tradicional, no existe una política clara sobre los acuerdos de subrogación, no podemos pretender suplir ese vacío con acuerdos privados carentes de oponibilidad jurídica.

Como pudimos apreciar, son muchas las jurisdicciones en los Estados Unidos que continúan desarrollando política pública o resolviendo a través de jurisprudencias las controversias sobre acuerdos de maternidad subrogada. Puerto Rico no es la excepción. Aunque nuestro ordenamiento ha comenzado a avanzar y nuestro nuevo Código Civil de 2020 ha reconocido la maternidad subrogada gestacional, queda mucho trabajo aun por hacer. Con el mejor bienestar del menor como norte, me es imposible validar los consentimientos médicos aquí presentados como un acuerdo de subrogación. Debemos tener en cuenta, que la Comisión que propuso el Borrador del Código Civil 2010 recomendó que, en los casos de maternidad subrogada tradicional, la filiación correspondiente sería la adoptiva. Recordemos que la señora López Rodríguez comparte un vínculo genético con el menor E.N., razón por la cual me reafirmo en mi posición que el procedimiento adecuado para que la madre intencional tenga la filiación con el menor es la adopción.

Por tanto, considerar estos consentimientos médicos como un acuerdo de maternidad subrogada tradicional que supone la entrega de una criatura sin la oportuna intervención de un proceso de adopción formal adolece de validez jurídica y atenta contra la ley y el orden público. No cabe duda, que el consentimiento médico suscrito entre el facultativo y la señora López Rodríguez es válido exclusivamente para el procedimiento médico al que fue sometida. No podemos extrapolar lo suscrito en un formulario médico a la controversia sobre filiación ante nosotros.

**IV**

Por los fundamentos expuestos, confirmaría en parte la Sentencia emitida por el Tribunal de Apelaciones.

Mildred G. Pabón Charneco
Jueza Asociada